889 A.2d 1120 (2006)
382 N.J. Super. 525
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
S.A., Defendant-Appellant,
In the Matter of the Guardianship of K.A.A., a Minor.
Superior Court of New Jersey, Appellate Division.
Submitted January 10, 2006.
Decided February 2, 2006.
*1121 Yvonne Smith Segars, Public Defender, for appellant (William J. Sweeney, Designated Counsel, on the brief).
Peter C. Harvey, Attorney General, for respondent (Michael J. Haas, Assistant Attorney General, of counsel, and Serena C. Robinson, Deputy Attorney General, on the brief).
Yvonne Smith Segars, Public Defender, Law Guardian for minor child (Christopher A. Huling, Assistant Deputy Public Defender, on the brief).
Before Judges AXELRAD, PAYNE and SABATINO.
The opinion of the court was delivered by
PAYNE, J.A.D.
Defendant S.A., the mother of K.A.A. (fictitiously, Kate), appeals from the entry of an order of guardianship that terminated her parental rights to the child. On appeal, she argues that insufficient credible evidence was presented to clearly and convincingly establish the first, second and fourth prongs of the "best interest" test initially formulated by the Court in New Jersey Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 604-11, 512 A.2d 438 (1986), and codified in N.J.S.A. 30:4C-15.1(a). Because we agree that the proofs were in some respects inadequate, we reverse.
S.A. is addicted to heroin. On May 17, 1999, she gave birth to a son, J.A., and on April 8, 2004, her parental rights to J.A. were terminated in a default judgment. Prior to termination, S.A. had been offered services on multiple occasions by the New Jersey Division of Youth and Family Services (DYFS) in an effort to treat her addiction. Although S.A. claims that she remained clean for seven months following one course of treatment, S.A. was in large measure noncompliant, and the services were ultimately unsuccessful. S.A. testified at the termination hearing in the present matter that Kate's father, whom she married on March 2, 2000, served as the trigger for her use of drugs. S.A. testified additionally that she now wants nothing to do with her husband, and that she cannot "stand him."[1]
*1122 In May 2002, S.A. was arrested for assault on a police officer in violation of N.J.S.A. 2C:12-1b(5)(a).[2] On April 2, 2003, she was arrested for possession of methadone without a prescription. She was indicted for that crime, and on October 6, 2003, she pled guilty. On February 13, 2004, she was sentenced to one year of probation conditioned upon the maintenance of full-time employment. Following a violation of that probation on grounds and at a time that are not stated in the record before us, she was sentenced on June 4, 2004 to a prison term of four years.
Two months later, Kate was born while S.A. was serving her sentence. S.A. testified at the hearing that she had used methadone after the child's conception because she had been informed by her doctor it was less dangerous to the child than heroin. She also testified that she had ceased the use of drugs entirely upon her imprisonment. However, records suggest that she was being prescribed methadone while in custody when the child was born.
Because of S.A.'s imprisonment, DYFS was notified upon Kate's birth, and supervision of her care was immediately assigned to that Division's Adoption Resource Center (ARC). Following temporary relinquishment of custody by S.A., a foster mother was identified, and that foster mother took custody of Kate upon her release from the hospital on August 19, 2004. At the time, Kate was classified as medically fragile because she had tested positive for the hepatitis-C antigen.[3] She also suffered from symptoms of drug withdrawal, which according to the foster mother, continued for the first three or four months of her life. Kate remains in the foster mother's care, and the mother has testified that she wishes to adopt her.
Twenty days after Kate's birth, DYFS filed a verified petition for guardianship. A hearing was held in the matter on February 23, 2005, when Kate was six months old. Testimony was offered by the foster mother, an employee of the ARC who had been assigned Kate's file a month earlier, and S.A. At the time of the hearing, S.A. was residing in the Millicent Fenwick halfway house in Paterson, which she had entered on February 3, 2005.[4] S.A. testified that her expected release date was August 20, 2005.
Evidence at trial disclosed no contact between DYFS and S.A. after Kate's birth, and it appears from the court's opinion in the matter that an order was entered pursuant to N.J.S.A. 30:4C-11.2a(3) relieving DYFS of any obligation to make reasonable efforts to prevent placement as the result of the termination of S.A.'s rights to her older child, J.A.[5] S.A. testified at the hearing that she had telephoned DYFS on a number of occasions, but had never received a return call. She testified that her mother had called as well, without response. S.A. stated that it was "[l]ike I don't exist or something."
At the hearing, S.A. stated that she wanted to gain custody of Kate, that she planned to reside upon release with her *1123 father, who lived along with other relatives in Lakewood, or to obtain a job and live in Paterson. She testified that she anticipated obtaining employment in April, and that she would not be released from the halfway house without evidence of adequate housing. However, she acknowledged that she would not be able to care for Kate immediately upon her release, and that her plans for the child were at that point indefinite. She stated:
Well, right now, I need to focus on me and get myself together because I can't care for a baby if I can't care for myself. I'm trying to get myself together.
S.A. testified further that she was trying to work out with her mother an arrangement for temporary care of Kate. She had completed anger management, life skills and parenting classes, and she was attending alcoholics anonymous and narcotics anonymous. When asked what assurance she could give that she would not resume the use of heroin, her drug of choice, S.A. stated:
I really can't give it. I have got to take it one day at a time. You can't really say that you know, I mean, I don't want to get high at all. I mean, I'm doing what I, I can put it like this. I'm in the halfway house.
I'm able to walk out that door anytime I want and have money in my hands. If I really wanted to go out and get high now, I could. But I don't choose to. I don't want to. I don't. I'm tired. I'm really tired. Like I said, I can leave whenever I want but I don't want to. I need to be there right now where I'm at. I need the treatment. You know what I mean? And I'm working hard. I'm doing what I have to do to stay clean.
No psychological evaluations were conducted of S.A. prior to the termination hearing, no bonding evaluations occurred, and no evidence was presented with respect to the suitability of DYFS's plan that Kate be adopted by her foster mother, other than the foster mother's conclusory statement that Kate was "flourishing" in her care. Testimony by the foster mother disclosed that she had four other adoptive children age eighteen, sixteen, thirteen and twenty-one months, as well as a biological child age seven. The eighteen-year-old suffered from a pervasive developmental disorder, and the twenty-one month-old had asthma and undescribed "developmental issues." Testimony at the hearing, consisting of thirty-three transcribed pages, was truncated and cursory, and cross-examination of witnesses was virtually nonexistent.
Although evidentiary deficiencies existed in the hearing, the Family Part judge ordered termination of the rights of Kate's parents in an order dated April 22, 2005 and amended on June 30, 2005.
In a written opinion that accompanied the court's order, the judge considered the evidence in light of the four-prong best interest test of N.J.S.A. 30:4C-15.1a, and he found that DYFS had established each prong by "more than" clear and convincing evidence. The rights of Kate's biological father were terminated on the ground of abandonment. With respect to S.A., a matter of far greater difficulty, the judge first found that Kate's health and development had been and would continue to be endangered by any parental relationship  the first prong of the statutory test  "since the parents have not demonstrated any ability to care for [Kate]." He found further: "The parents have failed to protect their child from harm through their continued substance abuse and unstable lifestyle. [Kate] was born while her mother was in jail."
The judge found additionally that the second statutory prong had been met by evidence that demonstrated that S.A. was either unable or unwilling to eliminate the *1124 harm to Kate, and that further delay in her permanent placement would add to the child's harm. The judge asserted without elaboration that all available relatives had been investigated for possible placement in connection with the termination of S.A.'s rights to her older child, J.A.[6] The judge also stated that, "after listening to the foster parents and hearing the opinion of health care professionals, any separation from the adoptive foster parents could cause serious and enduring emotional or psychological harm to the child." However, our review of the record does not disclose any evidence other than the fact of continuous custody from birth to six months of age that could be related to bonding, and no health care professionals either rendered a report or testified on the subject. Finally, the judge noted that S.A., who remained in custody, had "failed to support or make a permanent plan for the child." "Accordingly," the judge found, "delaying permanent placement would only add to the harm [Kate] is suffering."
The court did not substantively address the third prong of the statutory test, which requires evidence of diligent efforts by DYFS to provide services to the parents to correct the circumstances that led to the placement, since he found that performance to have been excused pursuant to N.J.S.A. 30:4C-11.2 as the result of the termination of S.A.'s rights to J.A.
As a final matter, the court concluded that termination of S.A.'s parental rights would not do more harm than good (the fourth prong of the statutory test) as the result of evidence of the absence of any present parent-child relationship between S.A. and Kate, the inability of S.A. to provide emotional or financial support to the child, and the existence of a pre-adoptive placement in which Kate was "doing well and flourishing." Termination of S.A.'s parental rights was thus ordered, and guardianship of Kate was placed with DYFS.
We find, following our review of the record in this matter, that the evidence was insufficient to support the court's conclusion that termination was warranted, and that the court's rationale for reaching a contrary conclusion was flawed. In reaching this determination, we stress the constitutionally-recognized significance of S.A.'s parental rights and of the fact that those rights can be abrogated only upon clear and convincing evidence, obtained by reasoned application of the best interest standard, that the State's parens patriae responsibility to protect the welfare of the child requires the court's intervention. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982) (recognizing parent's fundamental liberty interest in raising a biological child); In re Guardianship of K.H.O., 161 N.J. 337, 347, 736 A.2d 1246 (1999) (balancing constitutional right with State's interest by use of the best interest test); In re Guardianship of J.C., 129 N.J. 1, 9-10, 608 A.2d 1312 (1992) (same). The best interest test is thus no legal make-weight, but rather an essential protection to the rights of parent and child alike.
When viewed in this light, we regard several of the aspects of this case as troubling, including the speed at which the termination of S.A.'s rights was accomplished; *1125 the excessive reliance upon her relatively short period of incarceration as a justification for that termination; the failure to assess the strength and potential impact of S.A.'s recognition of a need for treatment and resolve to remain drug-free; and the absence of any testimony with respect to the suitability of Kate's foster mother as an adoptive parent, the extent of bonding that had occurred, or the nature of any harm that Kate would sustain if that bond were severed.
That S.A. was incarcerated at the time of the birth of Kate, and that the incarceration arose from admitted illegal methadone use are facts that the court correctly recognized as relevant to a determination whether maintenance of S.A.'s parental ties to Kate is in Kate's best interest. In re Adoption of Children by L.A.S., 134 N.J. 127, 135, 631 A.2d 928 (1993). However, the Supreme Court has recognized that "it is by no means settled or obvious that incarceration is so inimical to the [parental] relationship as to justify its termination as a matter of law." Id. at 137, 631 A.2d 928. Presumptions of unfitness may not be used in proceedings to terminate parental rights, and all doubts must be resolved against termination. Id. at 133, 631 A.2d 928.
Nonetheless, "[i]mprisonment necessarily limits a person's ability to perform the `regular and expected parental functions,' N.J.S.A. 9:3-46a." Id. at 138, 631 A.2d 928. It also may serve to frustrate nurturing and the development of emotional bonds and as a "substantial obstacle to achieving permanency, security, and stability in the child's life." Id. at 139, 631 A.2d 928; see also J.C., supra, 129 N.J. at 26, 608 A.2d 1312 (recognizing the need for a permanent and stable relationship with a nurturing parent figure). Additionally, the nature of the crime causing the incarceration bears upon the issue of parental fitness and the potential for rehabilitation. L.A.S., supra, 134 N.J. at 141-43, 631 A.2d 928. The length of the custodial term is likewise an important consideration. Id. at 140, 631 A.2d 928.
Any hearing conducted to determine whether a parent's rights should be terminated must be based upon a "broad inquiry" as to each of these circumstances and their significance in relation to the overriding questions of parental fitness and the best interests of the child. Id. at 143, 631 A.2d 928. The court must consider the nature of the parent's criminal disposition, the extent of any rehabilitation and, with the aid of expert opinion, the need of the child for permanency and stability and whether continuation of the parental relationship will undermine that need. Id. at 144, 631 A.2d 928.
We find in this case that the inquiry mandated by L.A.S. and the best interest test in general lacked a sufficiently broad focus. The evidence presented demonstrated that S.A. suffered from a significant narcotics addiction, and that prior to her incarceration and the birth of Kate, she had been unwilling to recognize or address her problem. However, there was also unrefuted evidence in the record that S.A. had finally acknowledged her addiction and had made substantial and thus-far successful efforts to address it. This evidence was barely acknowledged by the Family Part judge and not measurably discussed by him, and no expert testified to its significance. Yet the Supreme Court has recognized that "the cornerstone of the [best interest] inquiry is not whether the biological parents are fit but whether they can cease causing their child harm." J.C., supra, 129 N.J. at 10, 608 A.2d 1312; see also A.W., supra, 103 N.J. at 607, 512 A.2d 438. "The burden falls on the State to demonstrate by clear and convincing evidence that the natural parent has not cured the initial cause of harm and will *1126 continue to cause serious and lasting harm to the child." J.C., supra, 129 N.J. at 10, 608 A.2d 1312. In this case, the court's focus was solely upon evidence relevant to the termination of S.A.'s rights to her son J.A. The judge did not substantially address the additional evidence arising thereafter or require its evaluation by an expert.
Further, the record demonstrates that the period of S.A.'s incarceration was anticipated to be relatively short, and that she would likely be released at about the time of Kate's first birthday. Although S.A. acknowledged an inability to care for her child immediately upon her release, the evidence disclosed efforts by S.A. to obtain the training and skills necessary to properly care for the child and at least the rudiments of a plan for temporary custody by S.A.'s mother and the establishment of a residence either with S.A.'s father or in Paterson.
We additionally note S.A.'s efforts to contact DYFS, as well as those of her mother, and the Division's failure to respond to those efforts.[7] We recognize the difficulty and likely futility of providing services to a person in custody, as well as the absence of any affirmative duty of the part of DYFS to offer services to S.A. to avoid placement as the result of the court's order entered pursuant to N.J.S.A. 30:4C-11.2[8] following the termination of S.A.'s parental rights to J.A. However, we do not construe that statute as providing a license to DYFS to ignore attempts at contact by biological parents whose children have been placed in DYFS's custody and whose rights have not been terminated, especially in the absence of evidence of the entry of any order pursuant to N.J.S.A. 30:4C-11.3 relieving DYFS of its obligation to provide efforts toward reunification of Kate with her mother. Further, we do not rule out the imposition of duties on the part of DYFS pursuant to N.J.S.A. 30:4C-11.2 and -11.3 if, on remand, the court should find that circumstances warrant them.
We observe in this regard that entry of an order pursuant to N.J.S.A. 30:4C-11.2 on the basis of a prior termination requires a court to find both evidence of that termination, N.J.S.A. 30:4C-11.2a(3), and that "[e]fforts to prevent placement were not reasonable due to risk of harm to the child's health or safety." N.J.S.A. 30:4C-11.2b.[9] The Supreme Court has recognized instances in which termination of a parent's rights to a child was justified to further the goal of permanence, if efforts at rehabilitation were of too prolonged a duration. K.H.O., supra, 161 N.J. at 356-59, 736 A.2d 1246. However, if rehabilitation has proven successful, the fact that the parent's rights to a first child have *1127 been terminated should not be utilized as a per se test to deprive the parent of DYFS's services in connection with a later-born infant. Just as the fact of imprisonment cannot create a conclusive presumption of parental unfitness justifying termination, a prior termination of parental rights cannot, as well.
We have noted that the record lacks evidence of any order entered pursuant to N.J.S.A. 30:4C-11.3, but that statute may also have relevance to this case. N.J.S.A. 30:4C-11.3, which addresses reunification, unlike N.J.S.A. 30:4C-11.2, which addresses placement, does not establish a two-pronged applicability test. But although the first part of N.J.S.A. 30:4C-11.3 recites that DYFS "shall not be required" to attempt reunification upon evidence that the parent's rights to another child have been involuntarily terminated, N.J.S.A. 30:4C-11.3c, the statute additionally provides:
When determining whether reasonable efforts are required to reunify the child with the parent, the health and safety of the child and the child's need for permanency shall be of paramount concern to the court.
This section shall not be construed to prohibit the division from providing reasonable efforts to reunify the family, if the division determines that family reunification is in the child's best interests.
The imposition of a dual standard of proof under N.J.S.A. 30:4C-11.2, including the requirement of evidence that efforts on DYFS's part were not reasonable as the result of likely harm to the child, and the additional language that we have just cited in N.J.S.A. 30:4C-11.3 that identifies considerations of both permanency and family reunification in determining the best interests of the child provide a further statutory basis for our conclusion that the termination of S.A.'s rights to one child does not conclusively establish S.A.'s ineligibility for DYFS's services, should DYFS or the court on remand deem them warranted.
We also find, as counsel suggested at the hearing in this matter, that the termination proceedings, occurring a mere six months after Kate's birth and while her mother remained in custody yet expecting a relatively quick release, were unjustifiably rushed. Although stability and permanency are recognized goals, e.g., N.J.S.A. 30:4C-1(f) (recognizing goal); K.H.O., supra, 161 N.J. at 357-58, 736 A.2d 1246; J.C., supra, 129 N.J. at 26, 608 A.2d 1312; New Jersey Div. of Youth & Fam. Servs. v. C.S., 367 N.J.Super. 76, 111, 842 A.2d 215 (App.Div.), certif. denied, 180 N.J. 456, 852 A.2d 192 (2004), no legislation or case law requires that a final determination of parental fitness be made in a span of time as short as that afforded in this case.[10] Were S.A.'s term of imprisonment significantly longer and her prospects for rehabilitation negligible, perhaps this speed could be justified. However, in this case, the speed with which DYFS and the court proceeded was detrimental to S.A.'s rights, since it precluded contact between S.A. and Kate, frustrated extended efforts at rehabilitation and discouraged *1128 any meaningful attempts to accomplish post-incarceration planning. At the same time, no competent evidence suggested the presence of a concomitant benefit to Kate.
As a final matter, we note the absence of any inquiry into the suitability of the ARC's plan for Kate's future care and of any expert testimony with respect either to S.A.'s potential fitness as a parent, the existence of bonding between Kate and her foster mother, and the extent of any harm that would be sustained by Kate if her foster care were terminated.
S.A. testified at the termination hearing that she had remained drug-free for a substantial period, she was endeavoring to maintain that status, and she had no present desire to return to drugs. The likelihood of achievement of those laudable goals could not reasonably have been assessed at the time in the absence of expert testimony by one experienced in the treatment of drug addiction. S.A.'s drug abuse history from the time of the initial termination hearing to the time of a hearing on remand also will be of undoubted relevance to this issue.
In J.C., a case involving the effect of successful parental rehabilitation upon a termination decision after a far more lengthy period of foster care, the Court particularly emphasized the significance of expert testimony with respect to foster parent bonding and the effect of such bonding upon a child. It held that when termination is not sought on the grounds of current parental unfitness, but rather because of alleged harm to the child from severance of a bond with a foster parent, "[t]o show that the child has a strong relationship to the foster parents or might be better off if left in their custody is not enough." 129 N.J. at 19, 608 A.2d 1312. "DYFS must prove by clear and convincing evidence that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm." Ibid. "Such proof should include the testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with the foster parent." Ibid. Although valuable evidence could be presented by employees of DYFS or by a lay guardian ad litem, those witnesses, the Court held, were "not qualified to express opinions concerning psychological bonding and the harmful consequences to the children from its disruption." Id. at 23, 608 A.2d 1312. Absent that evidence, the Court found no valid determination of the best interests of the child could be made.
In the present case, no testimony, whether lay or expert, was offered regarding any emotional ties between Kate and her foster mother or the mother's husband, or the degree of emotional harm that would result from the severance of those ties, were it otherwise warranted. The issue takes on particular significance as the result of Kate's very young age at the time of the termination hearing and the relatively short period of time during which she had resided in her foster home.[11]
As a consequence of the foregoing, we find that critical evidence relevant to the second and fourth prongs of the best interest test of N.J.S.A. 30:4C-15.1a is lacking in this case. We therefore remand the matter to permit a psychological evaluation of S.A., including consideration of her continued amenability to rehabilitation and an estimate of time required for that rehabilitation, and a bonding study of Kate and *1129 her foster parents to occur and for opinions thus gained to be presented through expert testimony, along with other evidence relevant to S.A.'s status and Kate's well-being, at an expeditiously-scheduled hearing. In light of the additional information that may emerge on remand, DYFS has the statutory prerogative to reconsider its position regarding services to S.A. and the potential reunification of the family.
Reversed and remanded. Jurisdiction is not retained.
NOTES
[1] The father of Kate has not been in contact with S.A. since the day of the child's birth. He has made no effort to maintain contact with DYFS and has not visited his child. His whereabouts were unknown at the time of the termination hearing, and a default judgment was entered against him.
[2] The resolution of that charge does not appear in the record on appeal.
[3] No evidence was presented that Kate has contracted that condition. DYFS records indicate that Kate's chance of contracting hepatitis-C was three percent.
[4] Although the evidence is not entirely clear, it appears that S.A. may have previously entered the halfway house during the preceding fall, but that she was returned to prison after a fight occurring on October 21, 2004.
[5] The record does not include a copy of this order. Further, there is no reference in the record to whether DYFS obtained an order pursuant to N.J.S.A. 30:4C-11.3 relieving it of the duty to provide reasonable efforts to reunify Kate with her mother.
[6] In his opinion accompanying the order terminating S.A.'s rights to J.A., the judge had stated summarily that relatives had been either unsuitable or uninterested. We do not have the record in J.A.'s case, and thus cannot ascertain the evidence that supported the judge's initial conclusion. However, no evidence presently before us suggests that S.A.'s mother, with whom S.A. sought to temporarily place Kate, had been deemed unsuitable by DYFS, and there is no evidence that DYFS investigated her willingness to care for Kate.
[7] The DYFS case file discloses no contact whatsoever between it and S.A. following Kate's birth and S.A.'s temporary surrender of her custody.
[8] That statute provides in relevant part:

In any case in which the Division of Youth and Family Services accepts a child in care or custody, including placement, the division shall not be required to provide reasonable efforts to prevent placement of the child if a court of competent jurisdiction has determined that both of the following criteria are met:
a. One of the following actions has occurred:
* * *
(3) the rights of the parent to another of the parent's children have been involuntarily terminated or
(4) [omitted]; and
b. Efforts to prevent placement were not reasonable due to risk of harm to the child's health or safety.
When determining whether reasonable efforts are required to prevent placement, the health and safety of the child shall be of paramount concern to the court.
[9] As we have stated, the record does not reflect whether both these findings were made by the court.
[10] For instance, a petition for guardianship may be filed pursuant to N.J.S.A. 30:4C-15(d) if the parent has failed to remove the circumstances leading to a child's removal or placement for a period of one year following assumption of custody by DYFS. N.J.S.A. 30:4C-15(f) requires that a guardianship petition be filed "no later than when the child has been in placement for 15 of the most recent 22 months."

In K.H.O., supra, 161 N.J. at 356, 736 A.2d 1246, the Court cited cases in which reunification was permitted when the mother was able to rehabilitate herself sufficiently to assume custody of her child within periods of one year, In re Guardianship of K.L.F., 129 N.J. 32, 35, 608 A.2d 1327 (1992), and two and one-half years, In re A., 277 N.J.Super. 454, 469, 649 A.2d 1310 (App.Div. 1994).
[11] In K.L.F., supra, 129 N.J. at 42, 608 A.2d 1327, decided simultaneously with J.C., the Supreme Court noted evidence that a child's vulnerability to moving is very concentrated between the ages of nine and eighteen months. Kate was below that age at the time of the hearing, and is now above it.