# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0957-16T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

J.M.,

     Defendant,

and

F.A.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF F.A. and K.A.,

     Minors.

_____

Submitted October 17, 2018 – Decided November 9, 2018

Before Judges Fuentes, Accurso and Vernoia.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0026-14.

Joseph E. Krakora, Public Defender, attorney for appellant (John A. Albright, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Danielle Ruiz, Designated Counsel, on the brief).

PER CURIAM

Defendant F.A., who represented himself at trial with appointed stand-by counsel, appeals from the final judgment terminating his parental rights to two of his children, Felix, now eleven years old, and Kayla, now almost ten.[1] He contends the Division of Child Protection and Permanency failed to prove each of the four prongs of the best interests standard of N.J.S.A. 30:4C-15.1(a)(1)-(4) by clear and convincing evidence. The Law Guardian joins with the Division in urging we affirm the judgment. Having considered defendant's arguments in

---

[1] These names are fictitious to protect the children's identities.

light of the record and controlling law, we affirm the termination of his parental rights to Felix and Kayla.

The facts are fully set forth in Judge Wright's comprehensive twenty-nine page opinion, and need not be repeated here. We note only that the Division removed Felix and Kayla in 2013 from the home F.A. shared with the children's mother, J.M., after both had been arrested for drug offenses and J.M. tested positive for opiates. J.M. voluntarily surrendered her parental rights to these children before trial in 2015 in order to permit her parents to adopt them. Accordingly, the Division proceeded against F.A. alone. At the time of trial, F.A. had been in jail for over a year awaiting trial on charges of first-degree bank robbery.

In addition to the testimony of the case workers and experts called by the Division and the Law Guardian, the court heard from several other witnesses, including two of J.M.'s children from a prior marriage, a seventeen-year-old daughter called by the Division and a sixteen-year-old son called by F.A. Felix, then eight-years-old, testified in camera.

J.M.'s older children, who spent three or four days a week and every other weekend in their mother and F.A.'s home over several years, painted a picture of an increasingly chaotic environment following, first their mother's and then,

3

F.A.'s descent into heroin use. J.M.'s older daughter described finding needles and glassine envelopes with "little fish on them" stamped with the words "red funeral or dead funeral" all over the house. She recalled her mother and F.A. locking themselves in the bathroom or their bedroom while Felix and Kayla banged on the door begging to be let in, only to emerge altered and unable to care for the preschoolers.

Both of J.M.'s older children testified they tried to pick up the slack, feeding, bathing and comforting their younger half-siblings. But both acknowledged they would come home from school to find the younger children playing outside unsupervised, sometimes in the road, and often inappropriately dressed for the weather. They also related the domestic violence they witnessed, including loud arguments between their mother and F.A., ending in him pushing or punching her, and F.A.'s repeated beatings of Felix.

When F.A. asked J.M.'s older daughter on cross-examination whether she understood the difference between discipline and abuse, the seventeen-year-old replied:

> I do. The difference between discipline and abuse is discipline is when you're trying to teach your kids . . . right from wrong. A smack on the hand, a smack on the butt. Abuse is when you leave marks, when you leave bruises, when you traumatize the kid so much to the point where he's afraid of you when you speak.

4

> Specifically, [Felix]. You know, [Felix] would have hand marks on his behind, on his back. His arm would have bruises from the way you grabbed him. That's abuse. That's — that's not discipline.

J.M.'s son testified that when he was fourteen, he drank and smoked marijuana with F.A. Although called as F.A.'s witness and emotional about past fishing trips and bike rides, the boy confirmed his sister's account of his mother's and F.A.'s drug use and F.A.'s frequent beatings of Felix.

The Law Guardian's expert, Frank Dyer, testified to the psychological evaluation he conducted of F.A. and the bonding assessment he performed of F.A. with Felix and Kayla, as well as the bonding assessment he conducted of the children with their maternal grandparents, with whom they were then living. Dr. Dyer testified to his opinion that F.A. "has a prominent antisocial dimension to his personality" and "a lower than normative threshold for aggression." He explained it was F.A.'s

> position that he has really done nothing wrong, nothing blame-worthy; that the children were removed for unjust reasons; that he has been wrongly accused of a number of offenses, even offenses for which he, ultimately, served jail or prison time; and that, in a sense, he is a victim in this whole affair, without taking any sort of blame or acknowledging his sort of responsibility for the impact of his behavior on others.

Dr. Dyer opined that F.A.'s

5

> degree of denial far and away exceeds the normal degree of denial found in individuals who have an antisocial aspect to their personality, and that this degree of blatant denial, in the face of overwhelmingly contradictory evidence, points to this characteristic of loosely organized, eccentric, obscure, and thought processes that are not particularly related to reality.

Regarding the bonding assessment he conducted between F.A. and the children, Dr. Dyer reported that both Felix and Kayla, then seven and five, "were oppositional and negativistic" toward their father, refusing his offers of physical affection. Dr. Dyer found no existing bond between the children and their father, in stark contrast to the warm and loving relationship he observed between the children and their maternal grandparents. It was Dr. Dyer's opinion that F.A. "does not possess adequate parenting ability at the present time" because he "is not able to place the needs of his children above his own needs," "not able to appreciate the impact that his behavior has had on them; and that his characteristic irresponsibility, which relates to the antisocial dimension of his personality" the doctor "assessed, would prevent [F.A.] from being able to meet their needs in any kind of consistent manner."

Dr. Dyer concluded by testifying that the children would not suffer any harm by the court's termination of F.A.'s parental rights, and that, instead, it would be a "net positive" for both children. Removing them, however, from the

6

loving and stable home of their grandparents would, in his view, result in severe long-term harm to both Felix and Kayla. Dr. Dyer dismissed F.A.'s allegations that the children had been coached, describing "the reactions of the two children" to F.A. to be "at the extreme negative end" of all the parental rights cases in which he had been involved. He attributed the children's reactions to their previous attachment to F.A., explaining he "was once a hero to these children." F.A.'s heroin addiction, however, extinguished the children's good feelings, and his resultant unreliability and mistreatment of them led to their becoming "emotionally disengaged."

Dr. Herschman, the Division's expert, echoed Dr. Dyer's views of F.A. and the bond between the children and their grandparents. Dr. Herschman, however, did not conduct a bonding assessment of F.A. and his children because she was scheduled to do so after Dr. Dyer. Given the very negative reaction of the children to F.A. during Dr. Dyer's bonding assessment, she and the Division determined it was not in the children's best interests to subject them to another session with their father so soon thereafter. She testified in response to cross-examination by F.A. that a kinship legal guardianship would not be in the children's best interest because of their "strong need for permanency."

F.A. testified in his own behalf. He claimed he used heroin from 2000 until 2005, shortly before he met J.M., but did not use again until after the Division removed the children in 2013. He claimed he was a good father from when Felix and Kayla were born through their removal in 2013, that he never consumed drugs in their presence or beat them and always provided them a safe home environment. He testified the services the Division provided were directed at providing him parenting skills, which he did not need as he was already a capable parent, and that he was refused drug treatment because of his inability to get a ride to two sessions.

As to his alleged drug use, F.A. acknowledged a hair follicle test he took several months after the children were removed was positive, but claimed it did not prove he had ever used drugs while the children were in his care. He maintained the allegations that he used drugs while the children lived with him and beat Felix were manufactured for trial. He posited the children testified against him because they, wrongly, blame him for their mother's heroin addiction.

F.A. acknowledged his seven prior indictable convictions, dating from 2000 to 2008, and testified on cross-examination that he expected the seven indictments he was then facing would be resolved within a year, thus permitting

A-0957-16T4

him to resume care of Felix and Kayla. Noting his repeated request that the children's maternal grandparents assume custody of the children in a kinship legal guardianship, F.A. asserted "[t]here's no difference between them staying with their grandparents in permanent custody or them staying with them in a KLG until we [F.A. and J.M.] are able to take the children back."

Applying the statutory factors, N.J.S.A. 30:4C-15.1(a)(1)-(4), to the facts adduced at trial, Judge Wright entered a judgment terminating F.A.'s parental rights. The judge concluded there was no question but that F.A.'s "criminal activity and ongoing incarceration" as well as "his ongoing heroin addiction" pose a significant danger to Felix and Kayla's health and development. The judge found F.A. had not been able to care for either child for a considerable period and even if released in the near future, an unlikely prospect, could not do so because of his utter failure to acknowledge the children's needs or understand "their fear of him and desire to be with their maternal grandparents."

Judge Wright found F.A. remains "in significant denial regarding the impact his substance abuse, physical abuse and criminal behavior have on his children." He concluded F.A. was unable and unwilling to abate the harm he caused Felix and Kayla, noting his refusal to engage in the services the Division offered or get the drug treatment he needs. Focusing on the drug treatment

offered by the Division, the judge noted F.A. "sought to thwart hair follicle testing by shaving all the hair from his body prior to the scheduled test" and attended only one session of the substance abuse counseling the Division arranged.

The judge noted F.A.'s "testimony was remarkable in that he absolutely accepts no culpability for, or even recognizes how his behaviors harmed the children." Relying on the unrebutted opinion of the experts who testified, the judge concluded F.A. failed to avail himself of the treatment offered because he "simply does not accept that he has any problems to correct." The judge accepted the opinion of the experts that delaying resolution was counter to the permanency the children desperately needed and that KLG was not in the children's best interests. Again relying on the opinions of the experts, the judge found further delay would only exacerbate the harm the children had suffered. He rejected KLG as an option because, besides being contraindicated by the experts, the maternal grandparents had expressed a willingness to adopt.

Finally, Judge Wright found the Division proved clearly and convincingly that termination of F.A.'s parental rights will do no harm to Felix and Kayla and much good. Significantly, the Division's expert found no existing bond between them and F.A. In contrast, both experts testified that separating the children

from their maternal grandparents at this point will do them lasting damage. The judge found that only freeing the children for adoption by their grandparents will "provide the continuity, stability and consistency these children need."

F.A. appeals, raising the following several arguments under a single point heading:

> THE JUDGMENT OF GUARDIANSHIP AGAINST F.A. SHOULD BE REVERSED BECAUSE TERMINATION OF PARENTAL RIGHTS IS NOT CLEARLY AND CONVINCINGLY IN THE "BEST INTERESTS" OF F.A. III AND K.A. UNDER N.J.S.A. 30:4C-15.1A.
>
> A.    The trial court erred in holding that DCPP proved the first prong, that F.A. harmed F.A. III, and K.A. or would continue to endanger them, by clear and convincing evidence.
>
>> 1.    The lower court erroneously relied on unpled allegations of physical abuse and neglect of F.A. III and K.A., of which F.A. had no advance notice, to support its conclusion that prong one was satisfied, resulting in a due process violation.
>>
>> 2.    Contrary to the lower court's conclusion, there was no evidence presented that F.A. was using heroin before the children's removal, or that such use harmed the children or placed them at risk.
>>
>> 3.    The lower court erred in relying on F.A.'s arrests and incarceration as a basis for termination of his parental rights because it did

A-0957-16T4

not perform the requisite broad analysis under N.J. Div. of Youth & Fam. Servs. v. S.A., 382 N.J. Super. 525 (App. Div. 2006).

B.     The trial court erred in holding that DCPP proved the second prong of the "best interests" termination test by clear and convincing evidence.

C.     The trial court erred in holding that DCPP proved the third prong of the "best interests" termination test against F.A. by clear and convincing evidence.

  1.     The court's consideration of kinship legal guardianship was legally incomplete and insufficient to establish that it properly considered alternatives to termination of parental rights.

    a.     The court's inquiry into the statutory KLG factors was utterly incomplete.

    b.     Clear and convincing evidence did not establish that adoption by the maternal grandparents was "feasible" and "likely."

  2.     The record does not clearly and convincingly establish the reasonableness of DCPP's efforts to correct the circumstances which led to the improvident removal of the children.

D.     The trial judge erred in holding that DCPP proved the fourth prong of the "best interests" termination test, that termination will not do more harm than good by clear and convincing evidence.

12

We find no merit in those arguments and affirm substantially for the reasons set forth in Judge Wright's comprehensive written opinion of October 14, 2016.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0957-16T4