# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4234-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

L.H.,

      Defendant-Appellant,

and

J.L.M.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.L.M., JR.,

      a Minor.

_____

Submitted January 16, 2020 – Decided February 7, 2020

Before Judges Alvarez and Suter.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0017-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Beth Anne Hahn, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Erica L. Sharp, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Linda Vele Alexander, Designated Counsel, on the brief).

PER CURIAM

L.H. (Laura)[1] appeals the Judgment of Guardianship that terminated her parental rights under N.J.S.A. 30:4C-15.1(a). She contends the trial court erred because there was not clear and convincing evidence to support the court's findings. We reject her arguments and affirm the judgment substantially for the reasons expressed by Judge Mary K. White in her oral opinion.[2]

---

[1] We use initials and pseudonyms to maintain the confidentiality of the parties and their child. R. 1:38-3(d)(12).

[2] The judgment also terminated the parental rights of defendant J.L.M., who is the child's father. He has not appealed.

I.

Laura is the mother of J.M. (Jack) who was born eight weeks prematurely in February 2017, testing positive for methadone.[3] The hospital contacted the Division of Child Protection and Permanency (the Division). Laura acknowledged she had relapsed on heroin and wanted help for her drug addiction. She had been prescribed pain medication after a 2012 car accident then turned to heroin. She was staying at a motel or with her mother, with whom she had a difficult relationship. She had lost her housing through Housing and Urban Development (HUD) and needed to appeal.

Laura was not prepared to care for Jack. Her mother would not allow the Division to assess her home to see if Jack could live there. Jack's father, J.L.M., had a history of domestic violence against Laura and drug use. The Division was awarded custody. Jack has been living with the same non-relative resource family since then, who have expressed a desire to adopt.

Dr. Roger T. Barr conducted a psychological evaluation of Laura. He diagnosed she was suffering from "[m]ajor [d]epression, [g]eneralized [a]nxiety [d]isorder, and [s]ubstance [a]buse." He recommended individual and

_____

[3] Laura has two older children who are in the care of their paternal grandmother in Georgia.

3

relationship therapy, as well as a psychiatric evaluation to assess her need for medication. She was to continue participation in her substance abuse program.

Laura failed to attend over half of the Division-arranged individual counselling sessions and was discharged due to non-compliance.[4] She participated in an in-home parenting program, "It Takes a Family," where she was advised to maintain visitation with Jack to not harm "their attachment and bonding." Her substance abuse evaluation found she had a severe opiate use disorder in remission. Laura attended outpatient treatment sporadically and did not complete the program. She also denied any mental health issues.

Laura admitted to unsupervised visitation with Jack during times when J.L.M. exercised his parenting time. She claimed J.L.M. was abusing drugs. She wanted to be there to protect the child. In July 2018, Laura obtained a restraining order against J.L.M. because he "assaulted her and pulled a gun on her" while he was under the influence of heroin. After this, she relapsed and again began to use heroin.

Laura was hospitalized multiple times after that. She tested positive for cocaine and opiates. She reported suicidal thoughts, auditory hallucinations and depression, and was admitted for inpatient psychiatric treatment. On her release,

---

[4] She has had three referrals for individual counseling she has not attended.

she went to a different hospital and was discharged after a day. Laura was then involuntarily committed briefly, diagnosed with bipolar disorder and depression. She was prescribed medication, which was a "more significant and comprehensive medication regimen." In November 2018, Laura was found to be "acutely psychotic with hallucinations, delusions[,]" and diagnosed as suffering from schizoaffective disorder, bipolar type. The Division filed a complaint to terminate parental rights in October 2018.

In January 2019, Laura began an outpatient MICA[5] program, Fresh Start, to address her mental health and drug addiction issues. The program provided group therapy, medication counseling and monitoring, and symptoms management. She did not attend five days a week as recommended, but her drug tests were negative.

Laura maintained visitation with Jack in the early months following his placement with the resource family. She also had therapeutic visitation. In September 2017, Laura's visits were increased in length and were permitted in her home, however, she yelled at the workers, who had safety concerns about her care. Visitation was therefore returned to the Division's offices. Laura's participation became more intermittent. She occasionally failed to appear, was

---

[5] MICA is an acronym for the mentally ill, chemically addicted program.

late, left early, or failed to confirm visitation. By January 2019, when she was in the Fresh Start program, Laura visited with Jack once a week.

Dr. Melanie A. Freedman, a clinical and forensic psychologist, testified for the Division at the guardianship trial about Laura's history of drug use and mental health problems. She diagnosed Laura with "[o]pioid [u]se [d]isorder, severe, in early remission," although she was not certain Laura actually had abstained from using drugs. She also had a "[m]ajor [d]epressive [d]isorder, recurrent . . . in partial remission" with the risk of future episodes, a generalized anxiety disorder and a schizoaffective disorder. Dr. Freedman could not confirm whether Laura was bipolar.

Dr. Freedman testified Laura was not fully compliant with substance abuse treatment; she started to use cocaine after treatment for heroin. Laura was "not in full compliance" with her current programs.

Laura's mental health was another area of parenting-related risks. Dr. Freedman testified Laura would require a longer term stay at a dual diagnosis program for a better assessment to "pinpoint" what was "going on with her emotionally." Dr. Freedman noted Laura was not taking seriously the effect of domestic violence "and engaging in treatment for that specific purpose." Laura's housing situation was not stable; she had no employment. Laura acknowledged

6

she needed more time to get things in order; she was not suggesting the child be returned to her immediately.

Dr. Freedman testified that Laura could not provide a minimum level of safe parenting for the child and could not provide this in the foreseeable future. Her prognosis for change was "poor to extremely guarded."

Dr. Freedman's bonding evaluation concluded Jack was strongly attached to the resource family and identified them as his mother and father. He likely would regress and be at risk of long-term emotional harm and a host of other effects were he removed. Laura was a "friendly stranger." She did not think Laura could address the harms to Jack caused by separation from his resource parents. Dr. Freedman supported the plan for Jack to be adopted by the resource family.

Susan Flanagan, an addictions counselor at Fresh Start, testified the program had a mental health and an addictions component. All of Laura's drug screens were negative at the facility. Flanagan testified Laura was "very compliant" with their program. Laura attended the program three days per week, although the Division wanted her to attend five days. Laura was not receiving trauma focused therapy at this program. However, Laura understood "the link between addiction and mental health." Flanagan testified that the caseworker

told her to prepare Laura for adoption of the child because the case "was not going backwards."

Laura testified she was drug free as of October 5, 2018. Her plan was to move to Georgia with Jack, live with her other daughters and start a new life. The trial court ordered a hair follicle test. It was positive for cocaine, showing Laura had used cocaine within ninety days of the trial.

The trial court entered a Judgment of Guardianship on May 14, 2019, terminating Laura and J.L.M's parental rights to Jack. In Judge White's oral opinion, she found the Division had proven each part of the four-prong test under N.J.S.A. 30:4C-15.1(a).

With respect to the first prong—harm to the child—Laura was "functionally homeless even though she was with her mom" at the time Jack was placed with the Division. Jack's maternal grandmother would not allow her home to be assessed by the Division and her husband, Laura's stepfather, allegedly had been the perpetrator of domestic violence against her mother and had substance abuse issues.

Laura was living with her mother during the trial. She did not have a job. She told the caseworker she needed more time. Family members were assessed but ruled out to care for Jack. The court found Laura did not have a "safe or

stable home." Her only plan was to move to Georgia with Jack and reunite with her older children, who were in the care of their paternal grandmother. The court-ordered hair follicle test was positive for cocaine, indicating Laura had used cocaine within the last ninety days. The court noted Laura "really just started meaningful treatment for a . . . recently diagnosed bi-polar disorder." Under the second prong, the court found that there was nothing that made it impossible for Laura to participate in the services offered by the Division in the first year of the child's placement. Laura denied having mental health or drug abuse issues. The court found any further delay in permanency for Jack "will simply add to the child's harm" particularly when it is not clear when Laura "would be ready to parent and where she would have [a] safe home and with who[m]."

The trial court found the Division made "many, many efforts . . . with mom who was angry at the Division . . . ." The court could not find that she would not "have another slip before she really understands . . . [s]he's dealing with bi-polar disorder complicated by serious drug addictions because she's recently used cocaine" and expressed she did not have the mental health issues with which she was diagnosed. This was even though Laura had begun to "turn around" the first month the trial began. The court found the Division made

reasonable efforts even though it had not referred Laura to supplemental random screening. The court found Laura was not able to eliminate the harms facing the child.

The trial court rejected the argument the Division should not have scheduled a bonding evaluation until there were additional visits between Laura and Jack. The child had been in placement for nearly two years; Laura had missed many opportunities for visitation. The court found the Division "worked vigorously" to increase visitation opportunities for Laura. The "Division's post hospitalization ability to only re[-]establish visits at one hour a week before the bonding evaluation" was not in violation of its obligation to make reasonable efforts.

The court could not find that "termination of parental rights will not do more harm than good" because Jack had been out of Laura's care his entire life. The court found Dr. Freedman's testimony to be "persuasive," that Jack would suffer harm if separated from his resource parents. He would not be able to "trust adult connections" in the long term, and in the short term, would "suffer developmental setbacks." The court found "credible and logical" Dr. Freedman's testimony that Laura would not be able to mitigate these harms for the child. The court also found the caseworker to be credible. As for the

addictions counselor at Fresh Start, she was "[v]ery much a patient advocate" and although she did not "willfully misle[a]d the [c]ourt[,]" she was "not accurate" in simply assuming the court already had determined to terminate Laura's rights. The court found Laura was not "credible" or "accurate" in her claim the Division did not make reasonable efforts toward reunification.

On appeal, defendant contends the court erred by concluding the child's health and development has been or will continue to be endangered by his relationship with her. She disputes she is unable or unwilling to eliminate harms to the child. She contends she demonstrated her willingness to eliminate the harms, that her substance abuse disorder was in remission, and she was committed to addressing her mental health issues. Laura asserts the Division did not prove she was unable to provide safe and stable housing or that delay would cause harm to the child. She contends the Division did not make reasonable efforts to provide services for her. She argues termination of her rights would do more harm than good for Jack.

II.

N.J.S.A. 30:4C-15.1(a) authorizes the Division to petition for the termination of parental rights in the "best interests of the child" if the following standards are met:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a)(1) to (4).]

A trial court's decision to terminate parental rights is subject to limited appellate review. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007); see Cesare v. Cesare, 154 N.J. 394, 413 (1998) ("Because of the family courts' special . . . expertise in family matters, appellate courts should accord deference to family court factfinding."). The Family Part's decision to terminate parental rights will not be disturbed "when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs.

v. E.P., 196 N.J. 88, 104 (2008) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

Laura argues the trial court anchored prong one on her finding that defendant "was functionally homeless." She argues poverty does not equate to harm to the child and contends Dr. Barr opined she was not a danger to Jack.

In considering the first prong of the statutory test, the concern is "whether the parent has harmed the child or may harm the child in the foreseeable future." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 113 (App. Div. 2004) (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986)). In assessing whether the child has been harmed by the parental relationship, "a parent or guardian's past conduct can be relevant and admissible in determining risk of harm to the child." N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 573 (App. Div. 2010). The Division must demonstrate "that the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999).

Laura has long-standing substance abuse and mental health issues. She used cocaine within ninety days of the trial although somehow managed to have negative drug screening tests. This was despite years of substance abuse

13

treatment and counselling. She began to use cocaine even though she had undergone drug treatment for heroin addiction. Laura's visitation with the child was intermittent, because of her own failure to participate. In the two years since Jack's birth, Laura had not secured housing nor was she employed. Her lack of stability and contact harmed the child. "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999) (citing K.H.O., 161 N.J. at 352-54). A finding of abuse and neglect under Title Nine was not needed for the Division to satisfy prong one. See N.J. Div. of Youth & Family Servs. v. A.P., 408 N.J. Super. 252, 259-60 (App. Div. 2009). The record supports the judge's finding of harm, based on reasons other than poverty and more than lack of housing.

Laura argues the court erred by finding her unwilling or unable to address her past drug use or mental health challenges. She has been attending outpatient treatment and is in "early remission" according to Dr. Freedman, and has participated in therapy. Thus, Laura contends the court erred by finding that Jack would suffer harm if there were delay.

The second prong under the statute can be met "if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent

placement' will further harm the child." K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). The court considers "whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006) (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)).

Laura did not rebut Dr. Freedman's testimony that her ability to parent was limited and her prognosis for gaining parenting skills was guarded. Despite substance abuse treatment, Laura did not understand the negative consequences of her drug use. Her hair follicle test at the trial was positive for cocaine, indicating at least that she was not truly committed to treatment much less sobriety. Laura has serious mental health issues and was not stable psychologically. Just three months before the trial, she reported having auditory hallucinations.

Laura had many opportunities to cooperate with the services she had been provided. She had no actual plan for moving to Georgia. The caretaker of her other children and herself were having serious disagreements. And, if she were to relocate with Jack, he would be harmed by disrupting his bond with his

resource parents. Laura did not rebut the opinion of Dr. Freedman that she would be unable to ameliorate the harm to Jack caused by that disruption.

This case is not like New Jersey Division of Youth and Family Services v. S.A., 382 N.J. Super. 525, 533 (App. Div. 2006) cited by Laura. This case was not rushed, and the judge fully considered the bond between the child and resource parents, and the lack of a bond with Laura. It is distinguishable from New Jersey Division of Youth and Family Services v. F.M., 375 N.J. Super. 235, 259 (App. Div. 2005), as well because this trial judge extensively addressed the facts regarding Laura's conduct or omissions in concluding the best interest test was satisfied. And, unlike New Jersey Division of Youth and Family Services v. R.G., 217 N.J. 527, 557 (2014), this case did not involve an incarcerated parent and the "unique challenges that incarceration presents."

Laura contends the Division's efforts to assist her with reunification were not reasonable. She is critical of the Division's efforts to assist her with housing, with services and with assessing other relatives.

The record shows, however, that Laura was offered many services by the Division to address her substance abuse, mental health and parenting issues but had not overcome the issues that required Jack's placement with a resource family. It also considered her relatives for placement but none was a viable

alternative for Jack, nor does Laura suggest there is another relative where he could be placed. She testified at trial about a desire to move to Georgia, but had no actual plan about where she would live. She did not ask for assistance with her housing issues; her mother would not allow the Division into her house for an assessment. She would not discuss issues with her caseworker because she distrusted her.

Laura argues the parent-child bond was evident. She blamed J.L.M., the Division and her hospitalizations for disrupting visitation.

The fourth prong requires the trial court to balance the harms suffered from terminating parental rights against the good that will result from terminating these rights. K.H.O., 161 N.J. at 363; A.W., 103 N.J. at 610-11. It does not require a showing that "no harm" will result from the termination of parental rights, but involves a comparison of the child's relationship with the biological parent and the resource parents. K.H.O., 161 N.J. at 355. Thus, "[t]he question to be addressed under [the fourth] prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid.

Dr. Freedman's expert testimony that the child was bonded with the resource parents—who are the only parents the child has known—was not rebutted. He would suffer harm if that bond were disrupted. There was no evidence that Laura was able to ameliorate this harm, although the resource parents would be able to ameliorate harm caused by terminating Laura's parental rights. Dr. Freedman opined that by terminating Laura's parental rights, the child would be provided with "a strong sense of stability and the greatest opportunity for him to develop long-term emotional health." The record supports the Division's efforts to encourage visitation, but that Laura was inconsistent during her opportunities. The record established that the Division proved the fourth prong by clear and convincing evidence.

Because we find that the trial court's findings are supported by adequate, substantial and credible evidence in the record, we affirm for the reasons set forth in Judge White's oral decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18                                                      A-4234-18T3