# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1736-18T3

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

L.M. (Deceased),

     Defendant,

and

F.V.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.V.,

     a minor.

_____

Submitted January 6, 2020 – Decided February 26, 2020

Before Judges Ostrer, Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0235-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Beryl Vurnen Foster-Andres, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Ellen L. Buckwalter, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Linda Vele Alexander, Designated Counsel, on the brief).

PER CURIAM

Defendant, F.V. (Fred),[1] appeals from the Family Part's November 30, 2018 order terminating parental rights to his only child, J.V. (John), then six years old.[2] In addition to having a history of criminal activity and violence, Fred suffers from unresolved mental health and substance abuse issues. He has been incarcerated for all but two months of his son's life.

---

[1]  For the reader's convenience, we use pseudonyms for defendant, his son, his son's deceased mother, and his son's aunt.

[2]  The trial court issued a supplemental written opinion on February 25, 2019.

Judge Radames Velazquez convened a two-day evidentiary hearing after which he ruled that the Division of Child Protection and Permanency (Division) proved the four prongs of the best-interests-of-the-child test, N.J.S.A. 30:4C-15.1(a), by clear and convincing evidence. On appeal, defendant challenges the trial court's conclusions with respect to all four prongs. He contends, for example, that he never harmed his son, was not given sufficient parenting time, and will be released from prison soon. The Division and John's Law Guardian contend that the evidence at trial was sufficient and urge us to affirm the judgment.

After carefully reviewing the record in view of the parties' arguments, applicable legal principles, and standard of review, we affirm the termination of Fred's parental rights substantially for the reasons set forth in Judge Velazquez's initial and supplemental written opinions. Tragically, John's mother, L.M. (Lynne), is deceased. The trial court's order freed John for adoption by his maternal aunt, S.M. (Susan). She was a frequent presence in John's life prior to Lynne's untimely death and has since stepped in to serve as her nephew's caregiver. The trial court's decision to terminate Fred's parental rights, allowing for John's adoption by his aunt, is decidedly in the child's best interest.

I.

A-1736-18T3

Fred raises the following contentions for our consideration:

POINT I

DCPP FAILED TO PROVE THAT TERMINATION OF PARENTAL RIGHTS WOULD BE IN [JOHN'S] BEST INTEREST BECAUSE [FRED] NEVER HARMED HIS SON OR PLACED HIM AT RISK OF HARM, [JOHN] WAS NOT PRESENT FOR ANY SUBSTANCE USE OR DOMESTIC VIOLENCE, IT HAS NOT BEEN SHOWN THAT [FRED] HAS ANY MENTAL HEALTH ISSUES THAT WOULD RISK HARM TO HIS SON, [FRED] IS ENROLLED IN SEVERAL SERVICES, AND THE FATHER AND SON HAVE THE ABILITY TO BOND UPON [FRED'S] RELEASE.

    A. DCPP HAS FAILED TO PROVE THE FIRST PRONG OF THE BEST INTERESTS TEST BECAUSE [FRED] HAS NEVER HARMED HIS SON OR PLACED HIM AT A RISK OF HARM.

    B. DCPP HAS FAILED TO SATISFY THE SECOND PRONG OF THE BEST INTERESTS TEST BECAUSE [FRED] WILL BE QUALIFIED FOR PAROLE WITHIN A YEAR, HE IS PARTICIPATING IN A NUMBER OF SERVICES, AND IT HAS NOT BEEN PROVEN THAT HE REQUIRES PARENTING CLASSES.

    C. DCPP HAS FAILED TO MEET THE THRESHOLD FOR THE THIRD PRONG STANDARD BECAUSE [FRED] WAS NOT OFFERED SUFFICIENT PARENTING TIME WITH HIS SON.

4

D.   DCPP FAILED TO PROVE THE FOURTH PRONG OF THE BEST INTERESTS TEST BECAUSE THE LACK OF APPROPRIATE PARENTING TIME HINDERED [FRED'S] ABILITY TO BOND WITH HIS SON.

II.

The pertinent facts leading to the parental termination complaint are set forth comprehensively in Judge Velazquez's written opinion.  We presume the parties are familiar with that opinion, so we summarize the facts in this opinion, highlighting those we deem to be particularly relevant to the issues raised in this appeal.

The Division first became involved with the family in December 2011, when it received a referral from Jersey City Medical Center.  Lynne, who was pregnant with John, sought medical treatment for stab wounds to her back, neck, and arm.  She reported that Fred had attacked her with a knife in the presence of one of her three daughters.  The Division investigated and substantiated a finding of neglect against Fred.  Shortly thereafter, Fred was arrested and charged with aggravated assault.

Fred was incarcerated when John was born in August 2012.  In December 2012, he was convicted of receiving stolen property, possession of a weapon for an unlawful purpose, terroristic threats, resisting arrest, and distribution of a

controlled dangerous substance. He was sentenced to five years in prison and was released around February 2017.

Not long after his release, Lynne obtained a temporary restraining order against Fred after he tried to strangle her. During the Division's investigation into the incident, one of Lynne's other three children reported that Fred had threatened to kill Lynne. John confirmed that he saw Fred hitting Lynne. The Division did not seek a finding of abuse and neglect against Fred in relation to John but did substantiate abuse and neglect between Fred and one of Lynne's daughters.

Regrettably, in early April 2017, Lynne died from complications related to a heart condition. The following day, Fred was incarcerated for threatening to kill Lynne's sister, Susan. The Division executed a Dodd[3] removal of John and placed him with Susan. John has remained in Susan's care since then.

In March 2018, Fred pled guilty to various crimes including terroristic threats, resisting arrest, and eluding. He was sentenced to five years in prison. The following month he also pled guilty to simple assault. He is currently incarcerated and will not be eligible for parole until April 2020.

---

[3] A Dodd removal is an emergent removal of a child without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82 (the Dodd Act). N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

A-1736-18T3

At the guardianship trial, Nitzana Silverman, a Division adoption caseworker, testified that John has a loving relationship with Susan. Prior to the Dodd removal, John spent weekends with her. He is comfortable in Susan's home, and she has been attentive to his needs. The Division has no concerns regarding Susan's ability to care for John, and she has indicated that she wants to adopt him.

Joel S. Federbush, M.D., a psychiatrist, testified that Fred had an impulse control disorder. At the time of the evaluation, Fred was taking numerous psychiatric medications. During his incarceration, Fred received diagnoses related to his abuse of PCP, cocaine, alcohol, and hallucinogens. He also was diagnosed with mental health disorders, including schizophrenia, schizoaffective disorder, and impulsivity.

Federbush expressed concern about Fred's ability to remain substance free given that he previously relapsed immediately upon release from prison. Federbush also noted in his testimony that Fred did not set forth a specific parenting plan. Instead, he told Federbush that he would figure things out as they happen and do what was necessary.

Federbush opined that Fred's unresolved anger management and substance abuse issues would expose John to a risk of harm. Federbush thus concluded

that Fred could not be an effective or appropriate parent to John for the foreseeable future.

Albert Griffith, Ed.D., a psychologist, evaluated Fred on two occasions. He testified that Fred was unable to safely parent John due to his mental limitations, emotional state, lack of interest in obtaining treatment for his substance abuse, and lack of parenting skills. Griffith noted that Fred did not have plans for childcare. He also testified that Fred's plans for post-incarceration life included engaging in criminal activity to support himself. Griffith concluded that Fred would be unable to safely parent John for the foreseeable future.

Furthermore, Griffith determined that John has no attachment to Fred and that he did not consider Fred a source of support. Griffith testified that John was noticeably uncomfortable during the bonding evaluation. In contrast, John had a secure and healthy attachment to Susan. Griffith pointed out in his testimony that John was a special needs child. Griffith opined that John would likely remain a special needs child and that Susan would continue to meet those needs.

Fred offered no testimony or documentary evidence at trial.

III.

     A-1736-18T3

We begin our analysis by acknowledging the legal principles that govern this appeal. Our Supreme Court has held that a parent has a constitutional right to raise his or her biological child, which "is among the most fundamental of all rights." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012). However, the State as parens patriae may act to protect a child from physical or emotional harm. Ibid. A parent's constitutional rights, in other words, are not absolute and must yield to the State's interest in protecting a child from harm or endangerment. Ibid. Accordingly, the State can seek to sever the parent-child relationship when the interests of the parent and child are irreconcilable. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599, 602–03 (1986). Importantly, a child has a right to a permanent, stable, and safe placement. N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

The termination of parental rights should only be pursued when "proof of parental unfitness is clear." F.M., 211 N.J. at 448. In a termination proceeding, the trial court determines whether the Division has successfully established that the four elements of the best-interests-of-the-child statutory test have been satisfied. N.J.S.A. 30:4C-15.1(a). That statute requires that the Division prove by clear and convincing evidence that:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside of the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[Ibid.]

When applying the best interests test, a trial court must pay specific attention to a child's need for permanency and stability. In re Guardianship of DMH, 161 N.J. 365, 385–86 (1999). As a result, the trial court must consider "not only whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006).

A-1736-18T3

The scope of an appellate court's review of the decision to terminate parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." Ibid. An appellate court should defer to the trial court's credibility determinations and to its "special expertise in the field of domestic relations." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). An appellate court therefore should not alter the findings below unless there was a manifest denial of justice. N.J. Div. of Youth & Family Servs. v. V.K., 236 N.J. Super. 243, 255 (App. Div. 1989). However, the trial court's interpretation of the law and legal findings are reviewed de novo. R.G., 217 N.J. at 552.

IV.

A.

Under the first prong of the best-interests-of-the-child test, the trial court examines the effect of the harm that stems from the parent-child relationship over time. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506 (2004). It may consider both physical and psychological harm and, therefore, may base its termination decision on emotional injury in the absence of physical harm.

A-1736-18T3

See In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977) ("The absence of physical abuse or neglect is not conclusive on the issue of custody.").

Fred contends the trial court erred when it found the Division proved the first prong because he did not harm his son or place him at risk of harm. He argues, in this regard, that John was not exposed to his substance abuse issues, domestic violence, or mental health problems. Further, Fred argues on appeal that his lack of parenting experience and his present incarceration should not have been used as support for the first prong.

We conclude to the contrary that there is adequate, substantial, credible evidence to support Judge Velazquez's conclusion that Fred's relationship with John has caused harm to the child and will continue to expose him to harm that will negatively affect his health and development. The uncontradicted testimony of two experts, both found to be well-qualified and credible by the trial court, shows that Fred has unresolved substance abuse and mental health issues that will continue to threaten John's health and development. If, as Fred contends, he has not exposed John to his substance abuse, domestic violence, and mental health problems, it is only because he has had very little exposure to John of any kind.

We also reject Fred's argument that the trial court improperly considered the fact that he was incarcerated for most of John's life. There is ample support in the record to support the conclusion that Fred's absence from his son's life has contributed to John's instability. That absence is the direct result of Fred's decision to engage in criminal activity leading to his periods of imprisonment.

Our Supreme Court has explained that "[a] parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child."  D.M.H., 161 N.J. at 379 (citing In re Guardianship of K.H.O., 161 N.J. 337, 352–54); see also In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (stating that first prong is satisfied by showing that serious psychological damage could occur as result of parent's actions or inaction). We have previously held, moreover, that a parent's inability to remain out of prison could have negative effects on a child's stability. N.J. Div. of Youth & Family Servs. v. S.A., 382 N.J. Super. 525, 534–36 (App. Div. 2006) (discussing the impact of incarceration, including that it prevents adequate parenting); see also In re Adoption by L.A.S., 134 N.J. 127, 137–39 (1993) (explaining that court is allowed to consider parent's incarceration when determining whether or not to terminate parental rights).

A-1736-18T3

We add that the trial court did not use Fred's incarceration as a per se basis for terminating his parental rights. Rather, the trial court properly considered the effect of Fred's incarceration on the child as one factor among many relevant circumstances pertaining to Fred's parental fitness. Relatedly, there was ample evidence in the form of credible expert testimony that Fred would not become a fit parent upon his impending release from prison.

B.

Under the second prong of the best interest analysis, which is closely related to the first prong, parental unfitness can be demonstrated in two alternative ways. K.H.O., 161 N.J. at 352. First, a party can show that continuation of the parental relationship will likely cause future harm to the child. A.W., 103 N.J. 607, 615–16. This can be established by proving parental "dereliction and irresponsibility," which can be shown by proof of continued substance abuse, the inability to provide a stable home, and the withholding of nurturing and attention. D.M.H., 161 N.J. at 353.

The other way of establishing the second prong is by presenting evidence that removing the child from his or her resource placement would cause serious and enduring mental or emotional impairment. N.J.S.A. 30:4C-15.1(a)(2).

A-1736-18T3

Under this alternative approach, a trial court examines the bonds between a child and his or her resource parent(s). D.M.H., 161 N.J. at 382.

In this instance, the Division presented proof under both ways of establishing the second prong. Fred contends that the court erred when it concluded that the Division satisfied the second prong because he will qualify for parole next year and has participated in prison-based services. That argument misses the point. Judge Velazquez relied on ample, credible, and substantial evidence in the record when he concluded that Fred was unwilling or unable to eliminate the harm facing John and was unwilling and unable to provide a safe and stable home.

Federbush testified, for example, that while Fred complied with treatment during his incarceration, his past conduct indicated that he would immediately revert to a life of crime and resume abusing drugs upon release. We have previously recognized that "parents dabbling with addictive substances must accept the mandate to eliminate all substance abuse" and "[s]uch unabated behavior . . . causes continuing harm by depriving their children of necessary stability and permanency." N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 245–46 (App. Div. 2010); see also K.H.O., 161 N.J. at 363 (finding a parent's inability to overcome his or her own addiction in order to care for a

A-1736-18T3

child constitutes endangerment of that child). In <u>New Jersey Division of Youth & Family Services v. I.H.C.</u>, we explained that a parent's past conduct is relevant in determining his or her future conduct. 415 N.J. Super. 551, 576 (App. Div. 2010).

Furthermore, applying the alternative method for establishing the second prong of the statutory test, there was ample expert testimony that separating John from Susan would cause serious and enduring harm. Delay in providing John with a permanent home, moreover, would only add to the harm he has already suffered as a consequence of Fred's actions and absence.

C.

Under the third prong of the best interest test, the trial court must decide if the Division made reasonable efforts to reunify the family. N.J.S.A. 30:4C-15.1(c). Fred contends that the court erred when it held that the Division satisfied this prong because he was not offered sufficient parenting time with John.

We disagree. The record shows the Division coordinated with the Department of Corrections to provide services to Fred, facilitated visitation, and provided bonding and psychological evaluations. Services provided at the prison included: monthly meetings with the Division case manager; art therapy;

16

group therapy; individual therapy; relapse prevention services; and medication monitoring. We therefore conclude there was ample, credible, and substantial evidence in the record to support the trial court's conclusion that the Division made reasonable efforts aimed at reunification.

Furthermore, as explained in the supplemental written opinion, the trial court considered alternatives to the termination of parental rights and found by clear and convincing evidence that no alternatives existed. For example, the court heard testimony that the Division assessed all five relatives that Fred submitted as possible placements for John. The record reflects that all five family members were assessed and ruled-out. As the trial court noted, none of those family members appealed or requested a re-assessment. See N.J.S.A. 30:4C-12.1(b) ("If the department determines that the relative is unwilling or unable to assume the care of the child, the department shall not be required to re-evaluate the relative.").

Further, the record reflects that Susan was not interested in kinship legal guardianship. As a result, that was not an option. Finally, reunification was not a viable option because it would cause harm to John according to the testimony of Federbush and Griffith. See A.W., 103 N.J. at 605 (explaining that reunification is not option when it could cause harm to child).

D.

The fourth prong of the best interests test requires that the Division show that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The trial court may rely on expert testimony when evaluating the potential injury that a child may experience through the termination of parental rights against the harm that the child might suffer if removed from the resource placement. See K.H.O., 161 N.J. at 355–56 (considering expert testimony when evaluating the fourth prong).

Fred contends that Judge Velazquez erred when he held that the Division had proven the fourth prong because the lack of appropriate parenting time hindered his ability to bond with John. We reject that argument. As we have noted, the lack of parenting time in this case is the direct result of Fred's decision to engage in serious criminal activity warranting lengthy incarceration. His absence from John's life and resulting paucity of parenting time cannot be attributed to the Division. To the contrary, he alone is responsible for that circumstance.

In any event, we find ample, substantial, and credible evidence in the record to support the trial court's conclusion that the termination of Fred's parental rights would not do more harm than good. John and Fred barely have

A-1736-18T3

a bond, and John is not comfortable around his father. Fred lacks the necessary basic parenting skills and suffers from unstable moods. The trial court concluded, moreover, that the danger posed by Fred's parenting deficits would only be exacerbated by John's special needs. In contrast, the bond between John and Susan is strong. She has provided stability, encouragement, instruction, and protection.

V.

In sum, we hold that the trial court properly found that clear and convincing evidence was adduced by the Division to establish all four prongs of the statutory best interest test. The record, which includes credible and undisputed testimony of two qualified experts, amply supports the trial court's conclusion that Fred is unable to provide John a safe, stable, and permanent home. Given his history of addiction and mental illness, and his penchant for committing crimes and acts of violence, his unfitness to serve as John's parent will not change in the foreseeable future. Meanwhile, the termination judgment paves the way for John to be adopted by his aunt, who can provide him with permanency, stability, and love throughout his childhood and beyond.

To the extent we have not already addressed them, any additional arguments Fred has made on appeal lack sufficient merit to warrant discussion in this opinion.  <u>R.</u> 2:11-3(e)(1)(E).

Affirm.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1736-18T3