649 A.2d 1310

IN THE MATTER OF A., A MINOR.

Superior Court of New Jersey
Appellate Division

Argued October 17, 1994—Decided November 22, 1994.

456

Before Judges DREIER, VILLANUEVA and WEFING.

*Emily Arnow Alman* argued the cause for appellants (*Alman & Michaels,* attorneys; *Ms. Alman* on the brief).

*Sheila Crotty,* Assistant Chief Deputy Attorney General argued the cause for respondent New Jersey Division of Youth & Family Services (*Deborah T. Poritz,* Attorney General, attorney; *Barbara A. Harned,* Deputy Attorney General, of counsel, *Karen Kleppe Lembo,* Deputy Attorney General, on the brief).

*Stephen F. Pellino* argued the cause for respondent A.M. (*Basile, Birchwale & Pellino,* attorneys; *Mr. Pellino* on the brief).

*Donna Grozuczak,* Assistant Public Defender argued the cause as respondent Law Guardian for A. (*Susan L. Reisner,* Public Defender, *Ms. Grozuczak,* on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

This appeal is by the foster parents of A. from an order of September 16, 1993 directing the reunification of the child with his mother. On December 27, 1990, A.M. gave birth to a boy, A., who was born methadone-addicted. When he was six weeks old his mother brought him to St. Joseph's Hospital in Paterson, New Jersey. The Division of Youth and Family Services (DYFS) was called, and the mother signed a voluntary placement agreement with DYFS.

The infant was two months old when placed with the plaintiffs, E.F and L.F., who signed the standard foster parent-DYFS agreement which included permitted visitation by the mother and foster parent cooperation with reunification. Some time later, plaintiffs expressed their interest in adopting should the child not be reunited with his mother.

A.M. had a troubled background. She was heroin-addicted for five years prior to rehabilitation and had a history of drug and alcohol addiction from the time she was a teenager, but she had made various attempts at rehabilitation starting four months after the baby's birth. A.M. also admitted to a period of time as a prostitute and to shoplifting charges, and had been arrested for possession of controlled dangerous substances in August 1992, for which she was incarcerated for thirty days and put on probation for two years.

A.M. maintained monthly visits with the child except for the time she was incarcerated on the drug charges. While in jail, A.M. met with a new caseworker and affirmed her desire to cooperate with DYFS and regain custody of her son. After her release, A.M. completed a twenty-eight day drug rehabilitation program and has fulfilled the requirements of an intensive outpatient program, including weekly drug screenings which had at the time of trial proved negative. After rehabilitation, she obtained an apartment in Bergen County and has attended parenting classes.

Visits between the child and mother continued and were increased under the supervision of both Passaic and Bergen Counties' DYFS case workers, and in March 1993, overnight visitations were instituted. Plaintiffs, however, believed such visits should have been introduced more gradually. They contended that the child was having nightmares and exhibited violent behavior shortly after the overnight visits began. They then had A. evaluated by three psychologists who noted signs of psychological trauma and suggested that transfer of the child not be immediate. They also hired a private investigator to observe A.M., but the only possibly

damaging information that was gathered concerned her boy-friend.[1]

Before the mother's rehabilitation, the Passaic County Child Placement Review Board, aware of the difficulties that the mother was having with drugs, determined that the child could not be returned pending Board review. In December 1992, DYFS' Adoption Resource Center rejected parental termination, since the mother had made progress. In January 1993, the Board extended the goal of reunification with the mother for three more months, and finally on March 29, 1993, the Board approved DYFS' plan for reunification with the mother. The order to that effect was entered on April 19, 1993. A.M. then rescinded her voluntary placement agreement, and DYFS agreed to a reunification date of April 30, 1993. A psychological evaluation by DYFS' psychologist, Dr. R. Silikovitz, supported the reunification plan, including counselling for all parties. A.M. and DYFS executed the final case plan on April 27, 1993.

On April 30, 1993, the date of the scheduled return of the child to the mother, the foster parents made an application for an order

---

[1] We wish to comment upon DYFS' attack on plaintiffs' alleged intrusive efforts to gather and present evidence on the issue of A.M.'s ability and fitness to parent A. During the course of this case, plaintiffs have exhibited great concern for A. Indeed, this litigation first commenced when plaintiffs sought to minimize the psychological disruption attendant to the reunification with his mother, A.M. Subsequently, they perceived a danger to A. and also perceived an apparent unwillingness on the part of DYFS to investigate their concerns. They then hired a private investigator at their own expense. Their action in doing so was neither illegal nor in violation of any duty owed to DYFS.

The depth of plaintiffs' concern for A.'s future well-being is admirable. Foster parents serve a most important role in meeting the needs of the children of this State. Indeed these children often have the greatest needs. It is essential to the psychological health and emotional stability of those children that foster parents, DYFS and natural parents all strive to work together. Discord among them can only threaten that health and stability. We do not, in recognizing plaintiffs' efforts, wish to be understood, however, to have passed upon or approved all of the methods plaintiffs employed to achieve their goal, however admirable that ultimate goal may have been.

to show cause to stay the transfer of the child. The stated object of the stay was not for termination, but for a gradual return of the child to the mother. The stay was granted, a law guardian was appointed, and discovery was denied, although the DYFS case file was later supplied to plaintiffs.

Although there was some discussion concerning the foster parents' standing, Judge Passero determined to hold summary hearings in May 1993. He then ordered continued counselling for the mother and an evaluation by a psychologist who would make a recommendation to the court concerning a schedule for reunification. All parties entered into an interim consent order on July 1, 1993. The order left DYFS with legal custody of A. and physical custody with the foster parents. Various conditions were placed on the mother.

A court appointed expert, Dr. Dyer, evaluated all parties and made a final report stating that the transfer would be traumatic and harmful to A. but should not be prolonged if the court determined it should occur. He also felt that the mother was making a "solid beginning in her process of recovery, although she was in need of parenting skills training."

In July 1993, plaintiffs amended their complaint to include counts for guardianship, termination of parental rights, and custody or adoption. They based their complaint on the bonding associated with A.'s two years of living with plaintiffs, the special needs of the child, and the drug history and lack of parental skills of the mother. Their standing was again challenged.

During the ensuing hearings, the opposing sides differed on the interaction between the child and the mother. There is caseworker and other testimony that the child was comfortable with his mother and that she had a positive attitude towards the child. Her drug counselor testified that A.M. was doing well in recovery. E.F. testified, however, to physical and emotional problems when the child returned from overnight visits.

Dr. Dyer again opined that the separation trauma would cause irreversible harm to the child should he be removed from the foster parents. He recognized, however, that the mother displayed positive parenting. Another expert disagreed that there would necessarily be permanent harm to the child if there was appropriate therapy. After several other witnesses and exhibits over a total of ten days of trial, the court rendered a decision on September 16, 1993.

Judge Passero determined that (1) the foster parents did not have standing, (2) if there was standing, they did not prove their case by clear and convincing evidence under the standard of *New Jersey Division of Youth & Family Serv. v. A.W.*, 103 *N.J.* 591, 512 *A.*2d 438 (1986) and the applicable statutes, (3) reunification was to be accomplished on September 19, 1993 with visitation allowed with the foster parents if deemed appropriate, and (4) certain conditions were to be followed by the mother.

The foster parents' stay application was denied by this court on September 17, 1993, and the mother and son were reunited on September 19, 1993 after the mother had been drug free for eleven months. At the time of reunification, the child had lived with the foster parents for over two and one-half years and was thirty three months old. Defendants allege that A.M. has fully complied with all court orders and that all reports concerning her relationship with the child are positive. DYFS has not yet returned legal custody to the mother due to the pendency of the appeal. The mother and A. continue to live together.[2] After a conference in chambers on December 10, 1993 concerning the inability of the foster parents and the mother to work out visita-

---

[2] We were informed at oral argument that after continued extensive drug screening, A.M. has remained drug free. Although E.F. and L.F. contend that A. is now a sad child, A.M. and the DYFS caseworkers have observed him to be bright and happy in his new environment.

tion, the judge ordered therapy for the child and recommended it for the adults. Visitation was also encouraged.[3]

## I

Plaintiffs claim that they have standing to apply for guardianship, termination of parental rights, custody, and adoption. They base their claim, however, upon statutes and case law that affect placement of a child that has been committed to their care, not upon statutes relating to adoption or termination of parental rights. For example, plaintiffs rely in part on *N.J.S.A.* 30:4C–61 which governs placement hearings:

> In reviewing the report [of the Child Placement Review Board], the court may request that, where available, any written or oral information submitted to the board be provided to the court. The court shall make a determination based upon the report and any other information before it; provided, however, that if: ... (2) A party entitled to participate in the proceedings requests a hearing; ... the court may schedule a summary hearing.
>
> [*N.J.S.A.* 30:4C–61b.]

As noted in *The State of New Jersey in the Interest of L.L.*, 265 *N.J.Super.* 68, 75, 625 *A.*2d 559 (App.Div.1993), there is no indication of who a "party" is, but we assume that the foster parents are entitled to participate in such a placement hearing based on the requirement that a "temporary caretaker" receive notice. *N.J.S.A.* 30:4C–61c(5). *See Doe v. State*, 165 *N.J.Super.* 392, 403–404, 398 *A.*2d 562 (App.Div.1979). Plaintiffs in fact were permitted to participate in such a hearing during the July summary proceedings with discovery allowed as it pertained to the DYFS files.

The court in *Doe v. State*, noted that "New Jersey is committed to a liberal approach to the issue of standing." *Id.* at 404, 398 *A.*2d 562. Foster parents can insist on a hearing, call witnesses and cross-examine witnesses as well as have discovery. *Id.* at 406, 398 *A.*2d 562. In *Doe*, however, the court was dealing

---

[3] We were also informed at argument that A.M. has continued to permit regular contact between A. and the foster parents who often take A. to their home for weekend visits.

only with DYFS' decision to remove the child from the foster home and determine custody. The court decided that case on the "circumstances existing" there. *Ibid.* Other courts, without analyzing the difference between placement hearings and termination cases, applied the *Doe v. State* conclusions. *See New Jersey Division of Youth & Family Serv. v. D.T.,* 171 *N.J.Super.* 520, 526, 410 *A.*2d 79 (Juv. & Dom.Rel.Ct.1979) and *New Jersey Division of Youth and Family Serv. v. Torres,* 185 *N.J.Super.* 234, 245, 447 *A.*2d 1372 (Juv. & Dom.Rel.Ct.1980), *aff'd o.b.,* 185 *N.J.Super.* 182, 447 *A.*2d 1343 (App.Div.1982) (both termination cases). These courts apparently extrapolated the *Doe v. State* conclusion into the broad statement that "[t]he trend appears to be that foster parents should have standing in court on matters affecting their foster children." *New Jersey Division of Youth & Family Serv. v. D.T., supra,* 171 *N.J.Super.* at 526, 410 *A.*2d 79. The actual issue of standing there, however, related only to removal of the child from the foster home.

While the foster parents may have standing to be heard on the issue of removal of the child from their home, standing to initiate a hearing for guardianship, termination of parental rights, custody or adoption is based upon different principles. A petition for a DYFS guardianship may be filed for different reasons by particular parties.

Whenever (a) it appears that a court wherein a complaint has been proffered as provided in chapter 6 of Title 9 of the Revised Statutes, has entered a conviction against the parent or parents, guardian or person having custody and control of any child because of abuse, abandonment, neglect of or cruelty to such child; [ (b) is omitted]; or (c) it appears that the best interests of any child under the care or custody of the Division of Youth and Family Services require that he be placed under guardianship; or (d) it appears that a parent or guardian of a child, following the acceptance of such child by the division pursuant to section 11 or 12 of P.L.1951, c. 138 (C. 30:4C–11 or 12), or following the placement or commitment of such child in the care of an authorized agency, whether in an institution or in a foster home, and notwithstanding the diligent efforts of such agency to encourage and strengthen the parental relationship, has failed for a period of one year to remove the circumstances or conditions that led to the removal or placement of the child, although physically and financially able to do so, notwithstanding the division's diligent efforts to assist the parent or guardian in remedying the conditions, and the additional services available from the division within program

and fiscal constraints will not enable the child to be reunited with the parent or guardian: a petition setting forth the facts in the case, may be filed with the Family Part of the Chancery Division of the Superior Court in the county where such child may be at the time of the filing of such petition. *A petition as provided in this section may be filed by any person or any association or agency, interested in such child, or by the division in the circumstances set forth in items (c) and (d) hereof.*

[*N.J.S.A.* 30:4C–15; emphasis added.]

The circumstances set forth in (a) that would allow anyone to file a petition of guardianship were not met in this case, as there was no conviction of the parent for abuse, abandonment or neglect. The circumstances under (c) and (d), if met, would allow only DYFS, not "any person," to file for guardianship.[4] Transfer of guardianship to the State is "a prerequisite to having the child adopted by the foster parents or by another family." *In re Guardianship of J.C.,* 129 *N.J.* 1, 5, 608 *A.*2d 1312 (1992). In this case, DYFS was not petitioning for guardianship, but rather for the return of the child to his mother.

There are conditions under which the foster parents may apply to adopt their foster child.

Any husband and wife, who, as foster parents, have cared for a child continuously for a period of 2 years or more, may apply to [DYFS], for the placement of said child with them for the purpose of adoption and if said child is eligible for adoption, [DYFS] shall give preference and first consideration to their application over all other applications for adoption placements.

[*N.J.S.A.* 30:4C–26.7]

"This section does not give foster parents the right to adopt children after two years *unless* and *until* the children are eligible for adoption." *In re Guardianship of T.M.B.,* 273 *N.J.Super.* 353, 361, 641 *A.*2d 1118 (Ch.Div.1993) (citing *In re Adoption of Two Children by A.M.,* 170 *N.J.Super.* 320, 328, 406 *A.*2d 468 (App.Div. 1979)) (foster parents lacked standing to pursue termination,

---

[4] The statute could be read as permitting "any person, association or agency" to file a petition for (a), (c) or (d), and DYFS only as to (c) or (d). This would be a patently restricted interpretation concerning DYFS, which we take notice regularly intervenes in child abuse cases. We therefore subscribe to the alternative reading that "any person" may file as to (a), but DYFS, alone, may file as to (c) and (d).

guardianship and adoption when DYFS had already filed a separate complaint).

The statute permits the foster parents to apply, not to a court for adoption or termination of parental rights, but to DYFS. DYFS then exercises its discretionary authority, if the child had previously become a ward of DYFS after the grant of the application previously discussed. This right of foster parents to apply to DYFS for preferential treatment is so limited for the very reason that DYFS is the only proper party to have gone through the process of assuring the child was eligible for adoption. Here, however, the plaintiffs did not apply to DYFS but to the court, and A. was not at that time eligible for adoption.

Plaintiffs cite *Smith v. Organization of Foster Families for Equality and Reform*, 431 *U.S.* 816, 97 *S.Ct.* 2094, 53 *L.Ed.*2d 14 (1977) to support their argument that foster parents are not "strangers" and should have standing. *Smith*, however, was a case involving three separate sets of foster parents in which the children did not know their parents and had been with the foster parents many years. The case also dealt specifically with New York law. The Court stated that whatever liberty interest the foster family may have, it is less significant where the child is being returned to the parents. *Id.* at 847, 53 *L.Ed.*2d at 36–37. The question is left open as to how much due process would be required in such a situation.

Plaintiffs also can not rely on *N.J.S.A.* 9:3–37 *et seq.* for standing to adopt since it only applies to adoption through an "approved agency" which does not include DYFS.

## II

█ E.F. and L.F. also claim that their discovery rights were unduly limited. The foster parents' rights to discovery are dependant on the statutes and rules that would be applicable to summary hearings in the Chancery Division, Family Part and presuppose that the foster parents have standing.

Under *N.J.S.A.* 30:4C–61 the court may schedule summary hearings to determine the proper course for a child's placement. The statute states that "[t]he court may also request or order additional information from any other persons or agencies which the court determines have an interest in or information relating to the welfare of the child." *N.J.S.A.* 30:4C–61c. This allows for discretion on the part of the judge.

■ *Rule* 4:67 governs summary actions, and since here there is statutory authority for a summary action, the parties would proceed under *R.* 4:67–1(a). Proceedings initiated by DYFS are covered by *R.* 5:12, and discovery by *R.* 5:12–3:

All relevant reports of the Division of Youth and Family Services shall be available for inspection to the attorneys for the parties without court order. All other discovery by any party shall be permitted only by leave of court for good cause shown.

Thus the judge has control of discovery through the exercise of the court's discretion, except for the mandate for DYFS to provide its files for attorneys' inspection. Here, Judge Passero denied further discovery, but the DYFS file was provided.

In *Doe v. State, supra,* the court not only affirmed the standing of foster parents to have a hearing when DYFS sought to return a child to the birth parents but confirmed the foster parents' right of discovery. 165 *N.J.Super.* at 406, 398 *A.*2d 562. There, however, the discovery concerned the DYFS file. We still left it to the court's discretion to release the DYFS file and order psychological reports. *Id.* at 410, 398 *A.*2d 562. In the present case, the file was made available as were all psychologists' reports. The foster parents claimed they additionally needed (1) other psychological reports, (2) the testimony of the DYFS housekeeper, (3) more information on the mother's compliance with probation and drug rehabilitation and (4) information on her associates.

It was within the judge's discretion and reasonable to disallow additional psychological evaluations especially since five psychologists had already examined the child. Many witnesses were called and were cross-examined, including the private investigators who

reported on the activities of the mother and her boyfriend. There was no lack of evidence before the court, and the objectivity and validity of the summary hearings were not flawed. The other claims raised in plaintiffs' brief about DYFS' actions bear no relevance to the issue of allowable discovery, especially since ample witnesses testified to the issues raised by plaintiffs.[5]

## III

■ Even though the trial judge correctly had doubts about the foster parents' standing, he heard and ruled on the main issue of guardianship, termination of parental rights, custody and adoption. We have therefore also reviewed the merits of the case.

In *New Jersey Division of Youth & Family Serv. v. A.W.*, 103 *N.J.* 591, 512 *A.*2d 438 (1986), the Court recognized the competing interests of the parents and the state as *parens patriae*. There is a fundamental right to " 'conceive and to raise one's children. . . .' " *Id.* at 599, 512 *A.*2d 438 (quoting *Stanley v. Illinois*, 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558 (1972). There is also a state *parens patriae* role that allows the state " 'to protect minor children from serious physical or emotional harm. In some instances this may require a partial or complete severance of the parent-child relationship.' " *Ibid.* (quoting *In re Dep't of Public Welfare*, 383 *Mass.* 573, 421 *N.E.*2d 28, 36 (1981)).

The Court recognized that if it only considered the best interests of the child, the vagueness of that phrase would impinge on the constitutional rights of the parents. *Id.* at 601, 512 *A.*2d 438. It also emphasized that the best interests of the child does not

---

5 Plaintiffs claim that the "objectivity and validity of the 'best interests' hearing was (a) undermined by a DYFS policy change that resulted in 'adjusted' reports to the Trial Court concerning [A.] and the birth mother, which comprised the factual picture. . . ." This issue was not raised at the trial. As the issue was not raised before Judge Passero, it will not be reviewed by us. The issue does not rise to a constitutional issue of jurisdiction or to one of public importance. *See Deerfield Estates, Inc. v. Township of East Brunswick*, 60 *N.J.* 115, 120, 286 *A.*2d 498 (1972).

mean the "better interests" of the child as they relate to the financial or educational background of foster or adoptive parents. *Id.* at 603, 512 *A.*2d 438. The issue of the best interests of a child in our case is thus different than in a custody dispute between the child's parents where best interests is "dispositive." *In re Baby M.*, 109 *N.J.* 396, 445, 537 *A.*2d 1227 (1988) (suit by natural father and his wife to enforce parenting agreement by surrogate mother).

■ A petition for guardianship may be filed if the circumstances spelled out in *N.J.S.A.* 30:4C–15, *supra*, exist. There must have been a conviction of the parent for "abuse, abandonment, neglect ... or cruelty"; the best interests of the child require it; or the "circumstances or conditions that led to the removal or placement of the child" had not changed.

There are also statutory standards, effective September 10, 1991, that need to be met before a petition to terminate parental rights may be filed.

> The division shall initiate a petition to terminate parental rights on the grounds of the "best interests of the child" pursuant to subsection (c) of section 15 of P.L. 1951, c. 138 (C. 30:4C–15) if the following standards are met:
>
> a. The child's health and development have been or will continue to be endangered by the parental relationship;
>
> b. The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> c. The division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> d. Termination of parental rights will not do more harm than good....
>
> [*N.J.S.A.* 30:4C–15.1.] 6

---

6 The Court in *New Jersey Division of Youth and Family Serv. v. A.W., supra,* had previously established four similar standards "(1) The child's health and development have been or will be seriously impaired by the parental relationship." 103 *N.J.* at 604, 512 *A.*2d 438. The Court gave examples of physical or sexual abuse as evidence of impairment. *Ibid.* Additionally, there must be "actual or imminent harm." *Id.* at 616, 512 *A.*2d 438. "(2) The parents are unable or unwilling to eliminate the harm and delaying permanent placement will add to the harm." *Id.* at 605, 512 *A.*2d 438. In order to reach that conclusion, it is necessary to use reasonable foreseeability. *Id.* at 607, 512 *A.*2d

The court then makes the determination whether termination is in the child's best interest.

> If upon the completion of such hearing the court is satisfied that the best interests of such child require that he be placed under proper guardianship, such court shall make an order terminating parental rights and committing such child to the guardianship and control of [DYFS] . . . but at the final hearing a further order of commitment shall not be made as provided in this section, [DYFS] shall return the child forthwith to the parent or parents . . .
>
> [*N.J.S.A.* 30:4C–20.]

The Court in *A.W.* also adopted the "clear and convincing" evidence standard for parental termination cases because of the constitutional ramifications of such an action. 103 *N.J.* at 611–612, 512 *A.*2d 438. *See Santosky v. Kramer*, 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982). *A.W.* further recognized that reasonable efforts to reunite a family may in certain circumstances not applicable here be ineffective. *Id.* 103 *N.J.* at 610, 512 *A.*2d 438.

Here, there was ample evidence before Judge Passero that the mother would not endanger the child's health and development. There was no physical, mental or sexual abuse by A.M. following reunification. The potential harm to the child related to the mother's past drug use and lack of parenting skills. She eliminated this harm by completing drug counseling, remaining drug-free, and attending parenting classes. DYFS provided services to the mother and continued to supervise her actions. The mother, while getting a slow start on drug rehabilitation, has otherwise done everything she could to cooperate in the efforts towards reunification. There was visitation with the child from the beginning of the placement, and the child has now lived with his mother for well over one year. The termination of parental rights at this time could conceivably do more harm than good.

---

438. "(3) The court has considered alternatives to termination." *Id.* at 608, 512 *A.*2d 438. The Court recognized the "primary significance of the family as an intact social unit." *Ibid.* "(4) The termination of parental rights will not do more harm than good." *Id.* at 610, 512 *A.*2d 438. Thus *N.J.S.A.* 30:4C–15.1 virtually codified the *A.W.* standards.

In *State of New Jersey Division of Youth & Family Serv. v. T.C.*, 251 *N.J.Super.* 419, 598 *A.*2d 899 (App.Div.1991), we reiterated that the standards of *A.W.* must be followed, and we may not rely exclusively on foster parent bonding to terminate parental rights. There must be a finding of "substantial parental fault." *Id.* at 432–433, 598 *A.*2d 899. Foster parent bonding may only be justified as a determinative factor if there was clear and convincing evidence that there would be "grievous and irreparable psychological harm" to the child if the bond were broken. *Id.* at 440, 598 *A.*2d 899. This factor is clearly not present here. In *In re Guardianship of J.C.*, 129 *N.J.* 1, 7, 19, 608 *A.*2d 1312 (1992), the Supreme Court recognized that there are competing psychological theories concerning the importance of bonding as opposed to the resiliency of children to adapt to change. *Id.* at 19, 608 *A.*2d 1312. There is also a risk of harm if a relationship is denied between a child and its parent. *Id.* at 26, 608 *A.*2d 1312.

"[T]he cornerstone of the inquiry is not whether the biological parents are fit but whether they can cease causing their child harm." *Id.* at 10, 608 *A.*2d 1312. The Court in *J.C.* found that there was a lack of clear and convincing evidence to terminate parental rights. *Id.* at 18, 608 *A.*2d 1312. This was so even though the trial court found that the foster parent bonding had been prompted by the mother's actions, the special needs of the child, and the potential for a drug relapse by the mother. *Id.* at 17, 608 *A.*2d 1312. Similarly, in *In re Guardianship of K.L.F.*, 129 *N.J.* 32, 608 *A.*2d 1327 (1992), the Court followed *J.C.* Foster parent-child bonding was not to be used as an excuse to terminate the parent's rights where the mother had taken the necessary steps to ensure a proper home. Even recognizing the fact that there could be emotional problems brought on by reunification, the Court stated that "[t]he standard is not that the end result cause

no pain or trauma but that the child be kept from its parents only to avoid serious and lasting harm." *Id.* at 45, 608 *A.*2d 1327.[7]

Judge Passero recognized that there are competing psychological theories on bonding.[8] But there also was mixed expert opinion concerning the effect of removal of A. from E.F. and L.F. The judge evaluated the psychologists' reports and testimony and found they "left much to be desired." He concluded that there would naturally be some trauma in leaving the foster parents but not irreparable harm. The mother should not be penalized for the voluntary placement and the attempt to get her life together during her separation from the child. Since the child has been living with his mother for well over a year now, the initial trauma of separation from the foster parents is hopefully over, and continued therapy should be of help in overcoming any residual effects of the separation. The court gave recognition to the good care given by the foster parents but reaffirmed the goal of

---

[7] Of course there are cases where it is appropriate to consider bonding, because under special circumstances there would be serious harm to the child if the foster parent-child bond was broken. *See New Jersey in the Interest of L.L.*, 265 *N.J.Super.* 68, 625 *A.*2d 559 (App.Div.1993), where the father had killed the mother, *Id.* at 73, 625 *A.*2d 559, and the child had endured three separations during its first two years of life. *Id.* at 81, 625 *A.*2d 559. *See also In re Guardianship of J.T.*, 269 *N.J.Super.* 172, 634 *A.*2d 1361 (App.Div.1993), where the parents had shown no interest in the child for over a year, and DYFS filed a complaint for termination of parental rights. *Id.* at 177, 634 *A.*2d 1361. Although there was some contrary expert proof, the court found that the psychological evidence of irreparable harm was "overwhelming." *Id.* at 190, 634 *A.*2d 1361.

[8] Plaintiffs assert that bonding is not the only issue, but that the mother associates with "drug dealers and abusers" and had an "apparent inability to feel the child's distress." This does not seem borne out by the facts in the case. Plaintiffs were also concerned that the mother had only been drug free for a year when the child was returned to her. For that reason the judge encouraged foster parent visitation so that contact would be maintained should the mother have a relapse. While there are no guarantees that she will not go back on drugs, there is no evidence to the contrary. She shows no signs of harming the child and has support services available to her for the drug addiction as well as parenting. She has availed herself of these services, and there is no reason to assume she will not continue to do so.

reunification and hoped that the foster parents would be able to remain in the child's life.

The judge made factual findings and assessments based on the credibility of the witnesses and the other evidence presented. Great deference is to be shown to a judge's discretionary decisions in bench trials. *Rova Farms Resort Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). This deference will be shown as long as the evidence was "adequate, substantial and credible." *Ibid.* Based on the evidence presented, we concur that there was no clear and convincing proof that could be used to justify granting the plaintiffs' request for adoption or "long-term foster care." We concur both procedurally and substantively with the decision reached by Judge Passero.

Affirmed.