**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4267-17T2

D.M.H.,

    Plaintiff-Respondent,

v.

H.G.H.,

    Defendant-Appellant.

_____

           Argued January 9, 2020 – Decided June 12, 2020

           Before Judges Alvarez, Nugent and DeAlmeida.

           On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FM-09-2148-15.

           Nirmalan Nagulendran argued the cause for appellant (Miller Meyerson & Corbo, attorneys; Nirmalan Nagulendran, of counsel and on the briefs).

           Scott D. Danaher argued the cause for respondent (Snyder Sarno D'Aniello Maceri & Da Costa LLC, attorneys; Scott D. Danaher, of counsel and on the brief; Sarah Anne Sedlack, on the brief).

PER CURIAM

Defendant H.G.H.[1] appeals from provisions of the Family Part's August 31, 2017 amended judgment of divorce: (1) setting his child support and payments in lieu of alimony obligations; (2) determining the value of the marital home; (3) distributing a portion of the increase in value of a premarital asset to plaintiff D.M.H.; and (4) creating a constructive trust for his share of marital assets to ensure payment of his child support and other obligations.

We reverse the provisions of the amended judgment setting defendant's child support and payments in lieu of alimony obligations because the trial court erred when imputing income to defendant. We remand for redetermination of those obligations. We affirm the remainder of the amended judgment.

I.

The following facts are derived from the record and the trial court's oral opinion issued after a thirteen-day trial. Plaintiff and defendant were married in 2001 and had three children. As of the entry of the amended judgment of divorce, defendant was fifty-two, plaintiff was forty-eight, and their children were minors.

A.   Defendant's Income.

---

[1] We identify the parties by initials to protect the confidentiality of court records relating to domestic violence. R. 1:38-3(d)(9) and (13).

Defendant has a bachelor's degree in mathematics and economics and a master's degree in economics from a university in Ireland. He also has a senior commercial pilot's license but has not flown commercial airlines since the early 1990's when he worked for Ryanair, an Irish entity.

When the parties married, defendant was a voice broker in the foreign exchange market on Wall Street. He explained this position as being a "middle man," matching potential buyers of foreign currency with sellers and earning a commission on each transaction. He executes exchanges over the telephone, rather than electronically.

Defendant began working at Tullett, a Manhattan brokerage firm, in 1993. In his three highest salary years, defendant earned $500,000, $500,000, and $700,000 in consecutive years. After the financial crisis of 2008, his income decreased significantly. Defendant identified three reasons for the change: (1) advances in technology rendering voice brokers obsolete; (2) his age; and (3) the 2010 enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C.A. §§ 5301 to -5634; 15 U.S.C.A. §§ 1601 to -02, § 1631 (Dodd-Frank), and related regulations.

With respect to technology, screen-based trading programs using complex algorithms progressed to become "far more cost effective and efficient than a

voice broker." At trial, defendant predicted that within two years voice brokers would be obsolete.

Defendant testified his advancing age affected his earning capacity because most traders were younger than thirty-two, and the typical trader would not want to conduct business with someone of defendant's generation.

Finally, according to defendant, Dodd-Frank and related regulations changed the nature of his business. Defendant developed personal relationships with banking clients, who he commonly entertained several nights a week. He views these relationships as essential to his ability to generate transactions. After the 2008 recession, he entertained clients approximately only one night every other week. Since enactment of Dodd-Frank, brokerage firms are no longer permitted to entertain banking clients.

Defendant testified the Dodd-Frank regulations also curtailed banks' ability to trade and diminished their appetite for risk. As a result, trading volume decreased significantly, and brokerage firms contracted. According to defendant, while he once was able to facilitate a trade every five minutes, by the time of the 2017 trial he was lucky to make two trades in a ten-hour workday. Because of the contraction, voice brokers lost leverage to negotiate higher compensation. His employer cut commission rates by forty or fifty percent.

A-4267-17T2

Defendant left Tullett in 2013. The reasons for his departure were contested at trial. Plaintiff testified Tullett, dissatisfied with defendant's drinking habits, demoted him and reduced his pay to force him to leave. She testified defendant told her he was reprimanded for taking extended client lunches and returning to the office intoxicated.

Defendant denied being disciplined for his alcohol use and testified Tullett closed the desk at which he worked because Dodd-Frank prohibited brokerage firms from having competing desks. According to defendant, Tullett offered him a position at base salary of $100,000, but he declined and negotiated a deal to earn $300,000 at GFI, where he started working as a foreign exchange broker in 2013.

Beginning in February 2015, defendant's salary at GFI was cut to $250,000 per year because he was not meeting his contractual quota. He testified his failure to fulfill his quota was not his fault but resulted from changes in the industry. He was informed in writing by GFI he could be terminated at any time. A few weeks later, plaintiff filed for divorce.

On October 6, 2015, defendant's employment with GFI ended. According to defendant, approximately forty percent of GFI employees were terminated at that time. He testified GFI was moving toward paying brokers $100,000 per

year instead of $300,000. Because he did not supply his 2015 or 2016 income tax returns at trial, defendant's gross income for those years is not in the record.

After he was terminated from GFI, defendant left for Europe for about ten weeks. He testified the trip was to "go home[,] . . . regroup[,]" and explore employment opportunities. Although he claimed he interviewed unsuccessfully with Ryanair and a London brokerage firm, he produced no evidence of job interviews. Defendant ended his trip with a two-week stay in the Canary Islands.

After defendant returned from Europe, Tullett offered him a position as a foreign exchange broker for $75,000 a year. Tradition America (Tradition) thereafter offered defendant a position as a foreign exchange broker for $90,000 per year and commissions. Defendant started at Tradition in November 2016.

At Tradition, defendant earned a thirty-percent commission, and generated about $25,000 of business per month. He testified that prior to 2008 he earned a forty-percent commission and generated $100,000 in business in an average month. He also had a "seat cost" at Tradition for use of the firm's computer terminal and other expenses totaling about $98,000 a year, which diminished his net income.

Defendant testified his $90,000 salary represented the most he could earn in any occupation. According to defendant, voice brokering was a "niche

market," that was "dying," and he had a unique skill set not useful to brokering other types of financial products. He testified he was too "burned out" to find work in another field. He considered seeking a position in aviation but believed he would earn about $30,000 a year as a first officer and be subject to mandatory retirement at sixty-five.

Defendant presented Richard Higgs as an expert in the foreign exchange industry. He testified the field had contracted dramatically and the number of voice brokers had shrunk from about three hundred in 2007 to less than fifty in 2017. He testified he realized in 2008 the boom period for foreign exchange brokers was ending and told his employees, including defendant, to start saving or investing in other businesses. According to Higgs, while it was "very easy for a lay person to look at . . . compensation over the years and think that this is like any other industry and that income over the course of one's lifetime is linear . . . or increasing gradually," that was "just not the case here. This is a cliff."

Higgs testified the industry had gone from a fragmented, volatile, and "highly opportunistic" market to a heavily regulated field, which led to "a cascade of other outcomes." The first of these outcomes stemmed from the reduction in the number of banks. Because banks were foreign exchange brokers' clients, their contraction necessarily reduced brokers' commissions. A

7

broker, in Higgs's view, was "only as employable as his ability to make commissions. . . . [T]here's no other real value that a voice broker provides other than their relationships with particular banks." He opined that voice brokers had "no proprietary knowledge or information," but instead were "literally leveraging their relationships with two or three traders in order to get them to do business with them."

Second, according to Higgs, there was a dramatic consolidation of voice brokerage firms from more than a hundred at the beginning of this century to three in 2017. This came about because technology eliminated the "market manipulation" a voice broker could engage in with a trader now that all deals and interests are accessible on an electronic platform.

Third, according to Higgs, as technology expenses increased, brokerage firms pushed those expenses onto brokers.

Fourth, Higgs testified that following the 2008 financial crisis, the federal government bought several banks' toxic assets on the condition the banks limit speculation in foreign currency. Reduced speculation decreased market volatility, compressed commissions, and lowered brokerage firm income. In Higgs's view, Dodd-Frank resulted in voice brokers being paid what "they always should have been paid, which is very little."

A-4267-17T2

As a result of these and other factors, Higgs testified, the remaining voice brokers in the foreign exchange market, probably around forty-five in total, were making between $50,000 and $250,000 as a base salary. By contrast, between 2004 and 2012, the average salary for a broker in the market was about $400,000. He testified that voice brokers who left the industry were primarily in real estate sales or were insurance brokers.

Defendant, in Higgs's opinion, was a "good broker," but "never a top ten percent broker" and had been "skating along . . . the unemployability line." His best skill was "endearing himself to others" and "establish[ing] relationships" with traders, but that skill was now irrelevant in the field, "[b]ecause bank traders no longer trade on relationships . . . ." Higgs believed defendant was no longer capable of earning more than $100,000 a year as a voice broker and the prospect of him earning $250,000 was a "very long shot." According to Higgs, the problem was not "specific to him but endemic in the . . . market."

The trial court found defendant had "a significant earning capacity" as demonstrated by his prior income and had been "voluntarily unemployed during the majority of this litigation," and underemployed in his current position. The court concluded that, after losing his job in 2015, defendant failed to engage in "substantial efforts to find alternative employment or other means of earning

money in addition to his job as a foreign exchange broker," given that "the skills he ha[d] developed [we]re transferrable to other industries and he did not prove otherwise." In addition, the court found defendant "failed to show that he [wa]s unable to earn greater income in a different market or with a different position and admitted that he could earn more but was essentially 'burned out.'" Although the court found Higgs testified credibly about the industry, it concluded defendant "presented no reliable testimony as to his employability or overall diminished earning capacity by way of an expert."

Finding defendant to be "an industrious, intelligent and educated individual," the court imputed income to him of $300,000 annually. The court used the imputed income to determine defendant's child support obligation and payments in lieu of alimony.

B.     The Marital Home.

In 2008, the parties purchased a house in Weehawken that was the marital home for the remainder of their marriage. The house is on a cliff and has a view of the Manhattan skyline.

Three experts testified with respect to the fair market value of the home for purposes of equitable distribution, all using the comparable sales approach to determine value. A court-appointed real estate appraiser considered a number

of comparable sales, to which he made adjustments. He opined a fair market value for the home of $439 per square foot of living space. Although the house is 5425 square feet, he based his opinion of value on 2768 square feet of "livable area," which did not include the finished basement. He appraised the value of the house at $1,215,000.

The expert also considered high-rise apartments soon to be built between the house and the Hudson River, which would obstruct some, but not all, of the skyline view. In addition, he noted the house's cliffside location was "not the most desirable area for people with families."

Plaintiff's expert opined a fair market value of $1,235,000. He also excluded the basement area when determining value. Both experts testified that the appraisal industry standard is to consider a basement to be an amenity.

Defendant's expert opined a fair market value of $1,750,000 for the home. When reaching that opinion, he made significant adjustments to several of his comparable sales and included the basement, which contains four of the home's five bedrooms and has the best views of the skyline, in the home's living space.

Defendant testified he received an offer to purchase the marital home for $1,700,000 from his brother-in-law, an officer with an Irish real estate company. The brother-in-law testified he regularly bought and sold luxury real estate in

Europe. He had never been inside the house but saw it from the Hudson River and read defendant's expert's appraisal report.

The court determined the fair market value of the marital home to be $1,215,000 based on the opinion of the court-appointed expert. The court did not afford the opinion of defendant's expert great weight, finding he had deviated from industry standards with respect to his treatment of the basement.

C.     <u>The Hoboken Property.</u>

Before the marriage, defendant bought a residential condominium unit in Hoboken for $220,000. After the parties married, they lived in the unit briefly.

The unit was thereafter used as a rental property. Because defendant preferred not to engage with the homeowner's association, plaintiff was responsible for finding tenants, collecting rent, and otherwise operating the property. During plaintiff's management of the property, it was not in arrears on its mortgage or association fees.

After plaintiff filed for divorce, defendant took control of the property, including collecting rent. By the time of the trial, the property, despite generating approximately $6000 a month in rent, was in pre-foreclosure on its mortgage and line of credit. The trial court ordered the Hoboken property be sold "to insure the stability and financial support" of the children.

The trial court held that the central inquiry with respect to whether the Hoboken unit was subject to equitable distribution is whether "the incremental increase in the value of the property," during the marriage was attributable either to the joint efforts of the couple or to the individual contributions of plaintiff. The court found that plaintiff "was a full time homemaker for part of the marriage and child rearer," who also managed the Hoboken property "in all respects," including "assuring it was rented," and "dealing with the association members the defendant disliked." The court noted that during that period, there was never a late payment on the property.

The court found the parties pooled their resources during the marriage to pay expenses, including when the Hoboken unit served as the marital home. The court concluded "the increased equity in the premarital residence that resulted from payments towards the principal pay down of the mortgage as opposed to increasing the home values, [was] to be considered as a marital asset acquired by the parties during the marriage and thus subject to equitable distribution." The court directed proceeds from the sale of the property be distributed eighty percent to defendant and twenty percent to plaintiff.

A-4267-17T2

D.      The Constructive Trust.

Plaintiff testified that beginning in 2008, around the same time defendant's employment prospects were changing, his drinking increased and intensified. She described several instances she believed demonstrated defendant's "alcoholism, his utter lack of control and any level of responsibility to his family as a father." According to plaintiff, defendant was verbally and physically abusive toward her and family members on a number of occasions. In addition, plaintiff testified defendant was unavailable to her and the children for extended periods of time without explanation.

An expert in psychiatry, with a specialty in addiction, conducted a psychiatric and substance abuse evaluation of defendant and interviewed plaintiff. He diagnosed defendant with alcohol use disorder, having found a "clear pattern" of association between his drinking and his violent acts.

In a May 2015 consent order, defendant agreed he would maintain the family's financial status quo. He failed to do so by not paying bills and stopping payments on checks plaintiff wrote for household expenses.

Defendant also sabotaged the potential sale of a troubled bar in which he held an interest by refusing to sign closing documents. He sent a series of emails to an attorney involved in the transaction in which he said he would rather see

14

the bar "burn to the ground" than allow plaintiff and his business partners to profit from its sale. In an expletive-ridden email he threatened to castrate another attorney if he emailed him again. Defendant admitted he had been drinking when he sent that email and that it was "immature and childish."

While in Europe, defendant transferred €25,000 from the couple's joint account to his personal account at the Bank of Ireland. He testified he used the money to pay a debt but offered no proof of the debt or any payments. The person to whom the debt purportedly was owed testified at trial but did not mention the debt or any payments. While in Europe, defendant did not support his family financially, and made no payments on the mortgage or line of credit on the marital home or the line of credit on the Hoboken property.

During the marriage, the parties established college savings accounts for their children. The court found defendant withdrew approximately $77,000 from those accounts for his personal use and enjoyment after the divorce complaint was filed.

Between May 2015 and August 2016, defendant, while unemployed, withdrew from ATMs, or charged, a total of $14,446.37 at or near casinos. He testified that he gave the money withdrawn from ATMs to a friend to whom he had a debt. According to defendant, his friend is a professional poker player

who agreed to gamble with defendant's money and split his winnings to reduce the debt. He provided no documentary evidence to support his testimony.

On August 16, 2016, the trial court ordered one of defendant's 401(k) accounts be liquidated and placed in escrow, in part, to make current the mortgage on the marital home. Defendant withdrew $125,331.41 from the account and transferred $117,020 to his counsel. Of that amount, $25,000 was paid to each party's attorneys and about $55,000 was used to bring the mortgage current on the marital home. Defendant testified that he used the $8341.41 not transferred to his attorney to pay a friend rent for having stayed in his apartment.

Defendant admitted he had not made child support payments as previously ordered. As of trial, his child support arrears totaled $22,618. Plaintiff testified defendant's erratic behavior could jeopardize her financial interest and sought imposition of a constructive trust on defendant's share of marital assets.

The court found it "impossible to afford [defendant] great credibility," particularly with respect to his withdrawals purportedly to repay debts, about which he provided no proof. The court also concluded "[n]umerous examples of noncompliance by defendant . . . evidenc[ed] his inability to adhere to court orders and a pattern of continued noncompliant behavior . . . ." The court found defendant has alcohol abuse issues and a "pattern of conduct, which is of great

16

concern as [to] his stability and emotional well[-]being." The court concluded imposition of a constructive trust was "necessary, perhaps not permanently, but at the very least until all of the equitable distribution is finalized."

On August 31, 2017, the trial court entered an amended final judgment of divorce incorporating its decision.

This appeal followed. Defendant raises the following arguments:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION BY DISREGARDING NEW JERSEY LAW ON INCOME IMPUTATION.

POINT II

THE TRIAL COURT ABUSED ITS DISCRETION BY DISREGARDING THE FACTS AND EVIDENCE PRESENTED AT TRIAL WITH REGARDS TO THE DEFENDANT'S EMPLOYMENT AND INCOME.

POINT III

THE TRIAL COURT ERRED BY DETERMINING DEFENDANT WA[S] REQUIRED TO FIND [AN] ALTERNATIVE ADDITIONAL SOURCE OF INCOME.

POINT IV

THE TRIAL COURT ABUSED ITS DISCRETION BY ENTERING A CONSTRUCTIVE TRUST WHEREIN THE DEFENDANT WAS COMPLETELY

17

DEPRIVED OF HIS INTEREST IN THE MARITAL ESTATE.

POINT V

THE TRIAL COURT ABUSED ITS DISCRETION BY AWARDING THE PLAINTIFF THE DEFENDANT'S PRE-MARITAL PROPERTY.

POINT VI

THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THE VALUE OF THE MARITAL HOME.

## II.

Our review of a Family Part's order is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "[W]e do not overturn those determinations unless the court abused its discretion, failed to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence." Storey v. Storey, 373 N.J. Super. 464, 479 (App. Div. 2004). We must accord substantial deference to the findings of the Family Part due to that court's "special jurisdiction and expertise in family matters . . . ." Cesare, 154 N.J. at 413.

We must defer to the judge's factual determinations, so long as they are supported by substantial credible evidence in the record. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974). This court's "[a]ppellate review does not consist of weighing evidence anew and making

independent factual findings; rather, [this court's] function is to determine whether there is adequate evidence to support the judgment rendered at trial." Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 347 (App. Div. 1999) (citing State v. Johnson, 42 N.J. 146, 161 (1964)).  We review de novo the court's legal conclusions.  Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

In addition, there must be "deference to the trial court's credibility determinations[,]" N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007), "because it 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" City Council v. Edwards, 455 N.J. Super. 261, 272 (App. Div. 2018) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).

A.    Imputation of Income to Defendant.

In "any matrimonial action . . . the court may make such order as to the alimony or maintenance of the parties . . . as the circumstances of the parties and the nature of the case shall render fit, reasonable and just . . . ."  N.J.S.A. 2A:34-23.  "Underpinning the basis of every support order is the proposition the payor has the 'ability to pay' the amount set . . . ."  Dorfman v. Dorfman, 315 N.J. Super. 511, 516 (App. Div. 1998).

19

"[W]hen a parent, without just cause, is voluntarily unemployed or underemployed, income may be imputed to that parent to provide for the child's needs." Caplan v. Caplan, 182 N.J. 250, 268 (2005). "Inherent in a finding of 'underemployment' is the notion the obligor is intentionally failing to earn that which he or she is capable of earning." Dorfman, 315 N.J. Super. at 516; accord Strahan v. Strahan, 402 N.J. Super. 298, 312 (App. Div. 2008). "[T]he obligor must establish that he or she is earning at capacity, i.e., not underemployed, in order to avoid imputation." Storey, 373 N.J. Super. at 474.

"Imputation of income is a discretionary matter not capable of precise or exact determination but rather requiring a trial judge to realistically appraise capacity to earn and job availability." Ibid. When an obligor shows "a concerted effort to find the same work at comparable pay[,] . . . that obligor establishes that he or she is not voluntarily underemployed in the new job." Id. at 472.

Defendant argues the trial court mistakenly exercised its discretion when imputing income to him because the record establishes he was working at capacity in his chosen field after losing a higher paying position as a result of market changes beyond his control. We agree.

While the record supports the trial court's finding defendant spent more than a year not seriously pursuing maximal employment after he was terminated

by Tullett, it also contains undisputed evidence the voice trader foreign exchange market seriously contracted after the 2008 financial crisis as a result of the enactment of Dodd-Frank and related regulations and advances in technology.

The only expert testimony in the record with respect to defendant's earning potential is Higgs's opinion defendant is no longer capable of earning more than $100,000 per year in the field in which he has been employed for the entire marriage and nearly all of his adult life. We see no evidence supporting the finding he is able to earn three times that amount in his present field or in another profession, including aviation. See Ibrahim v. Aziz, 402 N.J. Super. 205, 212-14 (App. Div. 2008) (holding it is error to impute income that "bears no relationship to defendant's earnings or ability to earn money"). Defendant's age and relative lack of skills, along with market and legal changes make it unlikely he will earn more than he does at his present position.

We therefore vacate the portions of the amended final judgment of divorce establishing defendant's child support and payments in lieu of alimony obligations based on imputed annual income of $300,000. We remand for a new determination of defendant's child support and other obligations based on income reflecting market conditions in his field and his proven earning capacity.

B.    Valuation of Marital Home.

"Great deference is to be shown to a judge's discretionary decisions in bench trials." In re A., 277 N.J. Super. 454, 472 (App. Div. 1994).  In particular, "[a]s the finder of fact, the trial judge ha[s] the prerogative to evaluate the credibility of the testimony of . . . competing experts," and to determine which expert opinion is the most credible.  N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 258 (App. Div. 2019).

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001). "The comparable sales approach is generally accepted as an appropriate method of estimating the value of a single-family residence."  Elrabie v. Borough of Franklin Lakes, 24 N.J. Tax 158, 176 (Tax 2008) (citing Brown, 19 N.J. Tax at 377.)  This method of valuation has been defined as "[a] set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sales prices of the comparables based on the elements of comparison." Ibid. (alteration in original).

Our review of the record revealed the trial court's determination of the fair market value of the marital home is supported by adequate, substantial, credible evidence. <u>Cesare</u>, 154 N.J. at 411-12. Having heard the testimony of three expert appraisers, the court determined the opinion of value offered by the court-appointed expert applying the well-established sales comparison approach applicable to single-family homes was credible. We see no basis on which to disturb that conclusion.

C.    <u>Distribution of Premarital Assets.</u>

The "court may make such award or awards to the parties, in addition to alimony and maintenance, to effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage . . . ." N.J.S.A. 2A:34-23(h). The statute "should be construed, to the extent feasible, to effectuate the public policy underlying the equitable distribution law, which is to recognize that marriage is 'a shared enterprise, a joint undertaking, that in many ways . . . is akin to a partnership.'" <u>Weiss v. Weiss</u>, 226 N.J. Super. 281, 287 (App. Div. 1988) (quoting <u>Smith v. Smith</u>, 72 N.J. 350, 361 (1977)).

"Any property owned by a husband or wife at the time of marriage will remain the separate property of such spouse and in the event of divorce will be

considered an immune asset and not eligible for distribution." Valentino v. Valentino, 309 N.J. Super. 334, 338 (App. Div. 1998). However, such "[p]roperty 'clearly qualifies for distribution' when it is 'attributable to the expenditure of effort by either spouse' during marriage." Pascale v. Pascale, 140 N.J. 583, 609 (1995).

Whether "the appreciation during the marriage of a pre-owned asset will be subject to distribution" depends on whether the "asset is active or passive." Valentino, 309 N.J. Super. at 338. "Passive immune assets can be defined as those assets whose value fluctuations are based exclusively on market conditions." Ibid. "An active, immune asset involves contributions and efforts by one or both spouses toward the asset's growth and development which directly increase its value." Ibid. "When the increase in value is brought about solely through the efforts of the owner, that value is undistributable." Ibid.

However, "when such value is derived, in part or in whole, from the efforts of the non-owner, the appreciation is subject to distribution." Ibid. "The increased value of active immune assets must be considered eligible to the extent that it may be attributable to the expenditures or the effort of the non-owner spouse, and a determination must be made regarding the extent the original investment has been enhanced by contributions of either spouse." Ibid. "The

burden of establishing immunity rests upon the spouse asserting such immunity." Ibid.; accord Pacifico v. Pacifico, 190 N.J. 258, 269 (2007).

"Appellate review pertaining to the division of marital assets is narrow." Valentino, 309 N.J. Super. at 339. We "decide whether the trial [court] mistakenly exercised its broad authority to divide the parties' property and whether the result was 'reached by the trial judge on the evidence, or [was] clearly unfair or unjustly distorted by a misconception of law or . . . fact . . . .'" Ibid. (quoting Wadlow v. Wadlow, 200 N.J. Super. 372, 382 (App. Div. 1985)).

Having carefully reviewed the record, we reject defendant's argument that the trial court abused its discretion in awarding plaintiff a percentage of the Hoboken unit sale proceeds. The record contains evidence the parties pooled their resources when they lived in the property and paid its mortgage. In addition, plaintiff managed the property for years when it served as an income-producing rental unit. These facts constitute sufficient support for the trial court's conclusion the Hoboken property was an active immune asset of the marriage, subject to equitable distribution.

D.    Constructive Trust.

"[C]ourts are authorized to impose a constructive trust, wherever specific restitution in equity is appropriate on the facts." Flanigan v. Munson, 175 N.J.

597, 608 (2003) (internal quotations omitted).  "[A] constructive trust is a powerful tool to be used only when the equities of a given case clearly warrant it."  Id. at 611.  In determining whether a constructive trust is justified, courts employ a two-prong test.  Id. at 608.

"First, a court must find that a party has committed 'a wrongful act.'"  Ibid. (quoting D'Ippolito v. Castoro, 51 N.J. 584, 589 (1968)).  The "wrongful act" will "usually" be, but is not limited to, either "fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property."  Thieme v. Aucoin-Thieme, 227 N.J. 269, 288-89 (2016) (quoting D'Ippolito, 51 N.J. at 589).  "Second, the wrongful act must result in a transfer or diversion of property that unjustly enriches the recipient."  Flanigan, 175 N.J. at 608.  "To prove a claim for unjust enrichment, a party must demonstrate that the opposing party 'received a benefit and that retention of that benefit without payment would be unjust.'"  Thieme, 227 N.J. at 288 (quoting Iliadis v. Wal–Mart Stores, Inc., 191 N.J. 88, 110 (2007)).  "The circumstances in which a constructive trust may be imposed are as extensive as required to reach an equitable result."  Thompson v. City of Atl. City, 386 N.J. Super. 359, 376 (App. Div. 2006), aff'd as modified and remanded, 190 N.J. 359 (2007).

We agree with the trial court's conclusion that prong one is satisfied by defendant's "complete disregard, disdain and dismissive conduct towards the seriousness of court procedures, orders and requirements[,]" his "deficient efforts to replace income" when he was fired from Tullett, his "unilateral allocation of marital funds," and his "dissipation of marital assets" by accruing arrears on the Hoboken property. We also agree the second prong was established by defendant's decision "to spend money gambling, traveling, and dissipating assets" amounting to more than $125,000 rather than making reasonable efforts to comply with court-ordered child support. Imposition of a constructive trust was warranted.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4267-17T2